**SOUTHERN RAILWAY COMPANY,**
**Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-**
**SION and United States of**
**America, Respondents,**

**Family Lines Rail System, Intervenor.**

**No. 81–2133.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 19, 1982.

Decided June 18, 1982.

Eugene T. Liipfert, Washington, D. C., with whom Mark J. Andrews, Thomas R. Howell, and Maryann Clifford, Washington, D. C., were on the brief, for petitioner. Robert B. Donin, Washington, D. C., also entered an appearance for petitioner.

Harold E. Spencer, Chicago, Ill., with whom Thomas F. McFarland, Jr., Chicago, Ill., and John M. Cutler, Jr., Washington, D. C., were on the brief, for amicus curiae urging reversal.

H. Glenn Scammel, Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, Ellen K. Schall, Deputy Associate Gen. Counsel, I. C. C., John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Richard A. Hollander for intervenor.

Before WALD and GINSBURG, Circuit Judges, and GESELL,[*] United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This battle between two of the Southeast's most successful railroads requires us to determine how a participant in joint rates [1] may cancel its participation in those rates. Intervenor Family Lines Rail System (FLS) canceled certain joint rates with petitioner Southern Railway (Southern) by filing an amended tariff in September 1981. Respondent Interstate Commerce Commission (ICC) accepted the amended tariff for filing and refused to suspend or investigate it.[2] Southern contended before the agency and now contends before this court that the ICC was required by both 49 U.S.C.A. § 10705a (West Spec.Pamph.1982)[3] (added by Staggers Rail Act of 1980, Pub.L.No.

96–448, § 217(a), 94 Stat.1895, 1916–24) and pre-Staggers Act law to suspend and investigate FLS's tariff. The ICC, however, rejected Southern's construction of the governing statutes. *Family Lines Rail System—Unilateral Cancellation of Joint Rates*, 365 I.C.C. 464 (1981). We agree with the ICC's statutory construction and, under well-established law, have no power to review the ICC's discretionary decision not to suspend the tariff. Accordingly, we affirm.

## I.  BACKGROUND

On September 8, 1981, FLS filed a tariff purporting to cancel numerous joint rates with Southern. The tariff, which was to become effective twenty days later,[4] was filed without Southern's concurrence or acceptance, and in fact Southern vigorously protested the joint-rate cancellations in a petition filed with the ICC on October 12, 1981. Southern's petition demonstrated that, on many of the joint rates it sought to cancel, FLS was receiving revenues of at least 110% of its variable costs. Southern argued that upon such a demonstration the ICC was required by 49 U.S.C. § 10705a(c) to reject or at least suspend FLS's tariff. The statute cited by Southern provides, in relevant part:

(1) Notwithstanding any other provision of this title, any prior agreement in effect on the effective date of the Staggers Rail Act of 1980, or any requirement of the Commission, a rail carrier may cancel the application of a joint rate to a through route in which it participates,

*only in United States Code Annotated. Further citations to that Act will be to the version found in 49 U.S.C.A. §§ 10101–11917 (West Spec.Pamph.1982), though we will not acknowledge that fact in each citation.*

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

**1.** A joint rate is a rate charged by two or more railroads together to carry a single shipment over a given route, with each railroad carrying the shipment part of the way. Before setting joint rates, carriers agree on the division of revenue among themselves.

**2.** As noted *infra* part I, the decision not to suspend was reached by three levels of ICC decisionmakers. The full ICC affirmed this decision after this action commenced.

**3.** An up-to-date version of the entire Revised Interstate Commerce Act, and in particular 49 U.S.C. § 10705a, may be found in codified form

**4.** The effective date of the tariff was amended on September 16, 1981. The new effective date was October 24, 1981, which was 46 days after the filing of the initial tariff. Joint Appendix (J.A.) at 122. The apparent reason for this amendment was that the ICC staff was, at the time, requiring all joint-rate-cancellation tariffs to be filed on at least 45 days' notice. *See infra* note 9.

without the concurrence of any other rail carrier that is a party to such joint rate, unless another rail carrier that participates in such through route ... makes the demonstration described in paragraph (2) of this subsection.

(2) The application of a joint rate to a through route may not be canceled under this subsection if a rail carrier that participates in such through route ... demonstrates to the Commission that the canceling carrier's share of the revenues, under the joint rate in effect at the time the application of the joint rate is canceled, is equal to or greater than—

(A) 110 percent of the canceling carrier's variable cost of providing service over such route ....

. . . .

(4) If the demonstration described in paragraph (2) is made ... the tariff canceling the joint rate shall be considered by the Commission in accordance with section 10705 of this title. The existing joint rate ... shall remain in effect during the pendency of the Commission's consideration.

In response, FLS, although taking issue with some of Southern's calculations, admitted it was receiving 110% of variable costs over many of the routes in question. FLS urged, however, that this was irrelevant, for it claimed it was not proceeding under section 10705a, and therefore section 10705a(c)(2) by its own explicit terms[5] did not apply. Instead, FLS argued, its cancellation of joint rates was subject to the ICC's discretionary power, set out in 49 U.S.C.

§ 10707,[6] to investigate and suspend the cancellation. Should the ICC suspend the tariff for investigation, FLS would have the burden of proving that cancellation was consistent with the public interest. 49 U.S.C. § 10705(e).[7]

On October 21, 1981, the ICC Suspension Board announced by telephone that it had decided not to suspend or investigate the challenged tariff. Southern filed its petition for review in this court, together with a motion for stay pending review, the next day. Simultaneously, Southern sought administrative review from Division 1 of the ICC, which affirmed the Suspension Board's decision. We granted a temporary stay pending receipt of a response to the stay motion from the ICC. On November 4, 1981, we vacated our temporary stay, and FLS's joint-rate cancellations took effect on November 5. Southern continued to seek administrative relief, petitioning the ICC Chairman on November 9 to place the matter before the entire ICC. The ICC rejected Southern's arguments in a written opinion rendered December 15 and served December 17.

The ICC reasoned that nothing in the Interstate Commerce Act required carriers canceling joint rates to obtain the consent of other carriers participating in the joint rates. Like most tariffs, therefore, joint-rate-cancellation tariffs were subject to the ICC's discretionary power under section 10707 to suspend or not to suspend. Section 10705a mandated suspension in the circumstances set out in that section, stated the

---

5. Section 10705a(c)(2) prohibits an immediate cancellation only if a 110% showing is made *and* the cancellation is "under this subsection."

6. Section 10707(a) gives the ICC power, "[w]hen a new individual or joint rate ... is filed, to "begin a proceeding ... to determine whether the proposed rate ... violates this subtitle." Section 10707(c)(1) sets out certain findings the ICC must make in order to "suspend a proposed rate ... during the course of a Commission proceeding under this section." Section 10707(c)(2) places the burden of proving the § 10707(c)(1) factors on the protestant against the new rate.

7. Section 10705(e) provides in part:

> When the Commission suspends, for investigation, a tariff ... that would cancel a ... joint rate ... without the consent of all carriers that are parties to it or without authorization of the Commission, the carrier proposing the cancellation has the burden of proving that cancellation is consistent with the public interest ....

In a case to which both §§ 10705 and 10707 apply, the burden is on the protestant to prove the factors necessary to convince the ICC to suspend a tariff. *See supra* note 6. Once the ICC suspends, however, the burden shifts to the canceling party to show consistency with the public interest.

ICC, only if the canceling carrier *had elected to proceed under that section*, the 110% showing had been made by a protestant, and the ICC had decided to "consider" the tariff by conducting an investigation. In this case, said the ICC, FLS had elected not to proceed under section 10705a, but instead to invoke its cancellation rights under pre-Staggers Act law, taking the chance that the ICC might suspend under section 10707. Those rights had not been abrogated by the Staggers Act, which was intended to make joint-rate cancellation easier. Thus, there was now a "two-track system": cancellation under pre-Staggers Act law, or cancellation under section 10705a. FLS had tak-en the first track,[8] and the ICC declined to suspend.

Southern attacks the ICC's reasoning in this court,[9] on its most basic premise. The ICC has never, claims Southern, had statutory authority under the pre-Staggers Act law not to suspend joint-rate-cancellation tariffs in which all joint-rate participants do not concur. The Staggers Act was indeed intended to make joint-rate cancellations easier, argues Southern, but only by providing a single exception—section 10705a—to the requirement that the ICC suspend and investigate joint-rate-cancellation tariffs. FLS was thus necessarily invoking section 10705a's provisions, and the

8. The ICC reasoned that because 45 days' notice is required for a cancellation under § 10705a, *see* 49 U.S.C. § 10705a(f), whereas 10 or 20 days' notice is required for pre-Staggers Act cancellations, *see* 49 U.S.C. § 10762(c)(3), "[t]he canceling carrier's choice of the appropriate notice will thus inform the agency and potential protestants whether the carrier is using the new Staggers Act procedure." 365 I.C.C. at 467. We would expect the ICC, in the future, to require that carriers more explicitly state which "track" they are taking, but we agree that in this case, with no explicit statutory basis stated in the initial tariff, the amount of notice given is an appropriate test. FLS initially filed on 20 days' notice, though it later amended the effective date. *See supra* p. 3 & note 4. It thus appears that FLS contemplated from the start that its filing would be governed by pre-Staggers Act law.

Southern has not argued that FLS *intended* to file under § 10705a and then changed its tune once the 110% showing was made. Instead, Southern argues only that FLS was "[n]ecessarily invoking" § 10705a. Brief for Petitioner at 7. We asked at oral argument whether, if the pre-Staggers Act law was as the ICC contends, that ends the case. Counsel for Southern conceded that it "probably does."

9. The parties have also commented, in post-argument submissions, on four ICC decisions, each rendered after the *Family Lines* decision we are reviewing. Restructured Rates on Grain & Grain Prods., Conrail, No. 38689 (served Apr. 15, 1982); Restructured Rates on Recyclables, O/T Iron or Steel Scrap, Conrail, No. 38679 (served Mar. 31, 1982); Changes in Routing Provisions—Conrail—July 1981 (served Mar. 22, 1982); Family Lines System—Unilateral Cancellation of Joint Rates, 365 I.C.C. 569 (1982). We place no reliance on these decisions, and we express no opinion as to their correctness. We have, however, exam-ined these cases to see if—as Southern asserts—the ICC is acting in a manner inconsistent with the position it takes in this litigation.

There is only one arguable inconsistency between the decision we affirm today and one of the subsequent decisions. In No. 38679, the ICC states, slip op. at 3:

We recognize that *Family Lines* indicated that a carrier's choice between proceeding under Section 10705a as opposed to 10705(e) will be shown by publication of the proposal on 45 days' notice, and that Conrail filed this proposal on 45 days' notice. However, this fact, standing alone, may not compel a finding that Section 10705a governs here. The *Family Lines* decision was issued after Conrail's publication and was intended to provide guidance for cancellations proposed after the date of the *Family Lines* decision. At the time Conrail filed the cancellations at issue here, the Commission's staff was routinely requiring 45 days' notice on *all* nonconsensual cancellations. Thus, the fact that Conrail's cancellations were filed on 45 days' notice does not require disposition of this case under Section 10705a.

Tariffs canceling joint rates under pre-Staggers Act law must, according to the ICC, be filed on at least 10 or 20 days' notice, 49 U.S.C. § 10762(c)(3), whereas § 10705a(f) specifically requires 45 days' notice. *See supra* note 8. The ICC's one-time requirement of 45 days' notice might be read to suggest that the ICC initially regarded § 10705a as the only cancellation provision available.

We are unswayed by this "inconsistency," however. We see no reason to construe the ICC's cautious action, requiring 45 days' notice on all joint-rate cancellations until the scope of the new statute was construed, as precluding it from later taking the position that another statute, requiring 20 days' notice, sometimes governs cancellations.

ICC was under a mandatory duty to suspend when the 110% showing was made.

The case has been fully briefed and argued by petitioner Southern; amicus curiae The Fertilizer Institute (supporting reversal); the ICC; and intervenor FLS. The Antitrust Division of the Department of Justice, representing the United States, also joined the ICC's brief.

## II. REVIEWABILITY

■ At the threshold, there has been a suggestion by the ICC that because ICC decisions not to suspend filed rates have generally been held nonreviewable in the past, that must be true in this case as well. And indeed it is now established beyond all doubt that ICC decisions to suspend or not to suspend tariffs under section 10707 are committed to agency discretion and hence are outside our power to review. *See, e.g., Southern Railway v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); *Aberdeen & Rockfish Railroad v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289, 311, 95 S.Ct. 2336, 2351, 45 L.Ed.2d 191 (1975); *Arrow Transportation Co. v. Southern Railway*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *Arizona Electric Power Cooperative v. ICC*, 675 F.2d 303 (D.C.Cir.1982). Nothing in the Staggers Act alters the nonreviewability of decisions under section 10707. But section 10705a is a brand new enactment, and whether suspension actions by the ICC under that section are reviewable depends on congressional intent.[10] By using mandatory language in section 10705a ("[i]f the demonstration … is made … [t]he existing joint rate … shall remain in effect"), in contrast to the permissive language found in section 10707 ("the Commission may begin a proceeding"), Congress may have created judicially reviewable duties in the ICC.

We do not resolve the question of reviewability of action under section 10705a, for as we explain *infra* parts III–IV, FLS did not file under section 10705a. But we note that, because reviewability may depend on which statutory provisions are invoked, a court may now need to determine, as a preliminary matter, the statutory basis for ICC action before deciding whether the action is reviewable. *Cf. Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221, 1233–36 (D.C. Cir.1980) (examining FCC's construction of its statutory ability to accept tariff before determining reviewability of FCC's waiver of a rule), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

## III. PRE–STAGGERS ACT LAW

Southern's argument that the ICC has never been able to accept joint-rate-cancellation tariffs without suspending and investigating comes in two parts. First, Southern claims that 49 U.S.C. § 10762(b)(2) requires the concurrence of all participating carriers in a tariff canceling joint rates. That section provides: "A joint tariff … shall identify the carriers that are parties to it. The carriers that are parties to a joint tariff, other than the carrier filing it, must file a concurrence or acceptance of the tariff with the Commission …." Unilateral cancellation of joint tariffs, argues Southern, is prohibited by this section unless and until the ICC determines, under section 10705(e), that it is consistent with the public interest. Second, Southern contends that the ICC is unable to cite a single unreversed case in which it actually did fail to suspend a joint-rate-cancellation tariff, so it must have always lacked the power not to suspend.

The ICC responds that section 10762(b)(2), by its plain language, applies only to an establishment of or a change in a joint rate, not to a *cancellation* of a joint rate. The ICC further responds that it has always had the power to suspend or not to suspend; it has simply exercised that power consistently in the past to suspend joint-rate-cancellation tariffs. Southern replies:

10. "Although we will not lightly interpret a statute to confer unreviewable power on an administrative agency, … we have no choice in this case. For the ultimate analysis is always one of Congress' intent …." *Southern Ry. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979).

Does the Commission seriously mean to suggest that a joint rate is not "changed" when FLS cancels its participation in it? Definitions of the verb "to change" in *Webster's* include not only "to make different in some particular," but also "to make radically different" or "transform" or even "reverse." Certain it is that the scope and effect of the involved joint rates *do not remain the same* when FLS ceases to participate in them.

Supplemental Brief for Petitioner at 17 (emphasis in original) (citing *Webster's New Collegiate Dictionary* 185–86 (1977); *Webster's Third New International Dictionary* 373–74 (1976)).

■ We are unconvinced by Southern's argument. The statute's plain language supports the reading offered by the ICC, and Southern's attempt at a semantic reply fails. First, the word "change" does not appear in the statute at all, only the phrase "joint tariff." Second, playing with dictionary definitions devoid of legislative context can be a dangerous business in statutory construction. For example, the dictionary might be cited for the proposition that facially permissive language is actually mandatory. *See Webster's Third New International Dictionary* 1396 (1976) ("may ... 5: SHALL, MUST—used esp. in deeds, contracts, and statutes"). Third, even if we were to join in the game, a joint-rate cancellation would not necessarily effect a "change" in a joint rate. A canceled joint rate is not "ma[d]e radically different" or "transform[ed]" or "reverse[d]." It is simply obliterated.

But there are more important common-sense reasons why the ICC's reading of section 10762(b)(2) is correct. It would in-vite chaos to permit carriers to establish (or even change) joint rates without the consent of the other carriers involved. Southern could impose a wholly unwanted joint rate on FLS, and FLS could just as quickly change the terms to make them oppressive to Southern; the process would continue ad infinitum. But there is no comparable problem with the cancellation of joint rates; a single cancellation of a joint rate does away with that rate once and for all; it can only be affected further by a consensual or ICC-imposed re-establishment. Put simply, a joint-rate participant is like a gameplayer: he cannot unilaterally change the rules of the game, but he can always pick up his marbles and go home.

We are also unpersuaded by Southern's negative argument based on the lack of citations in *ICC Reports* of instances in which the ICC failed to suspend a joint-rate-cancellation tariff. Southern is quite correct in noting that a " 'free and easy' climate for pre-Staggers Act joint rate cancellations ... simply never existed." Supplemental Brief for Petitioner at 4–5.[11] But Southern misapprehends the reason why, before passage of the Staggers Act, it was difficult to cancel joint rates. This difficulty arose not from any automatic statutory obstacle to joint-rate cancellation, but from the ICC's consistent use of its discretionary powers under section 10707 to bring about "the routine suspension of proposed joint rate cancellations ... until a final decision could be reached on the merits." *Joint Rates via the Ann Arbor System*, 362 I.C.C. 493, 505 (1979), *rev'd on other grounds sub nom. Green Bay & Western Railroad v. United States*, 644 F.2d 1217 (7th Cir. 1981).[12] There may or may not be

---

11. Similarly, Southern's discussion of the legislative history of § 10705a convincingly demonstrates that "[n]o unfettered right of immediate joint rate cancellation existed in the pre-Staggers Act era." Supplemental Brief for Petitioner at 33. This is not seriously disputed. What *is* disputed is *how* the cancellation right was "fettered": by routine discretionary suspensions, as argued by the ICC, or by statutorily mandated suspensions, as argued by Southern.

12. Southern does not take issue with the portion of the *Ann Arbor* decision quoted in text. In fact, Southern uses this portion of *Ann Arbor* to bolster its argument that the ICC had a *statutory duty* to suspend joint-rate cancellations. Southern does, however, dispute the clear implication by the ICC in *Ann Arbor*, 362 I.C.C. at 505, that nonsuspension of joint-rate cancellations is within its discretion under § 10707. Southern places particular emphasis on the Seventh Circuit's reversal of the *Ann Arbor* decision.

some inconsistency between the ICC's routine suspension in the past and its failure to suspend in this case, but that need not concern us. So long as the ICC is exercising *discretion* under section 10707, and not avoiding any *statutory duty* to suspend, its action is unreviewable. *See supra* part II.

Furthermore, Southern itself seems to realize that in the past the ICC has recognized its power not to suspend joint-rate-cancellation tariffs. In addition to the *Ann Arbor* case, *see supra* note 12, Southern cites in its opening brief at page 44 four joint-rate-cancellation cases "where the agency did not suspend pending investigation."[13] Southern goes on to assert that the cases are—in Southern's words—"arguably" distinguishable. We agree that nice distinctions might be drawn between those cases and this one, but the thrust of those cases is clear: they support the ICC's argument. Southern, by contrast, has cited not one decision—judicial or administrative—in which it is even hinted that the ICC lacks the *statutory power* not to suspend. Indeed, were it not for section 10707, the ICC would seem to lack the power *to* suspend joint-rate-cancellation tariffs. Yet Southern somehow fathoms from the ICC's past routine suspensions and the language of section 10762(b)(2)—which nowhere mentions suspension—a *duty* to suspend. We cannot accept this argument.

## IV. CHANGES BROUGHT ABOUT BY THE STAGGERS ACT

■ Having agreed with the ICC and FLS that their actions were permissible under pre-Staggers Act law, we have little trouble in concluding that they remain per-

missible following passage of the Staggers Act. The words of section 10705a(c)(2) prohibiting unilateral cancellation in certain circumstances refer specifically to "cancel[lation] under this subsection." The legislative history of the Staggers Act also makes clear that section 10705a was designed to supplement, not to supplant, existing rights of cancellation.

> These provisions ... in no way imply an intent on the part of Conferees that a carrier's existing rights under the Act to secure improved earnings over specific routes should be limited.... [E]xisting remedies, assuming the Commission chooses to administer them in order to realize the revenue adequacy goals of the Act, should be adequate to remedy other joint route and division problems.

H.R.Rep.No. 1430, 96th Cong., 2d Sess. 112, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4110, 4144. "Clearly, the authority to cancel routes under the new section 10705a should not be construed to inhibit or prohibit the Commission from cancellations under existing law." 126 Cong.Rec. H10085 (daily ed. Sept. 30, 1980) (remarks of Congressman Staggers), *as corrected by id.* E4806 (daily ed. Oct. 2, 1980).

Indeed, Southern freely acknowledges that a "reading of the post-Staggers Act statute [that] served to *narrow* joint rate cancellation options existing under prior law ... admittedly would be untenable because the framers of the Staggers Act undeniably intended to *broaden* preexisting cancellation remedies." Supplemental Brief for Petitioner at 15 (emphasis in original) (citing 126 Cong.Rec. H8572 (daily ed. Sept. 9, 1980) (remarks of Congressman

This argument is somewhat inconsistent. Southern selectively endorses only those statements in *Ann Arbor* that, in Southern's view, support its argument; it rejects other statements by noting the judicial reversal. That reversal, however, had nothing to do with any of the ICC's statements about its suspension power. Instead, the court ruled that the ICC's public-interest determination, *after investigation,* was unsupported by substantial evidence. 644 F.2d at 1228–30. The court neither approved nor rejected the ICC's claim of discretion not to suspend or investigate joint-rate

cancellations, for the case presented no such question. We are now squarely faced with the question whether, under pre-Staggers Act law, the ICC may decline to suspend or investigate a joint-rate cancellation. We hold that it may.

**13.** Fibreboard or Pulpboard, Montana to California, 357 I.C.C. 211 (1977); Routing, Coal from Origins on L. & N., 313 I.C.C. 792 (1961); Cotton from Transcontinental Territory to the South, 311 I.C.C. 61 (1960); Atlantic Coast Line R. R. v. Southern Ry., 304 I.C.C. 655 (1958).

Eckhardt)). We read the pre-Staggers Act portions of the Interstate Commerce Act as allowing unilateral joint-rate cancellations subject only to contractual limitations and the ICC's suspension and investigation powers under sections 10705 and 10707. Southern's reading of section 10705a as the only possible means of canceling joint rates, therefore, narrows joint-rate-cancellation options and is accordingly untenable.

We perceive no anomaly in the coexistence of two methods of joint-rate cancellation. Section 10705a serves the distressed railroad (*i.e.*, one not recovering 110% of variable costs on the routes in question), which need only file its tariff in order to have joint rates canceled in forty-five days. Lest this cancellation power be abused—to prevent nondistressed railroads from seeking its procedural advantages—section 10705a(c)(4) mandates that the "existing joint rate ... remain in effect during the pendency of the Commission's consideration" when a showing is made that the railroad, despite proceeding under section 10705a, is recovering more than 110% of variable costs. The pre-Staggers Act sections, on the other hand, allow *all* railroads to cancel rates. A railroad proceeding under pre-Staggers Act law runs the risk that the ICC will exercise its discretionary, unreviewable suspension power—a risk not present for railroads canceling truly noncompensatory rates under section 10705a. But in a pre-Staggers Act proceeding, the ICC may also exercise its unreviewable power *not* to suspend—an advantage to railroads that are adequately compensated by present joint rates but perceive competitive advantages to be gained by escaping from them. In short, our reading renders no provision of the Interstate Commerce Act "surplusage," as Southern contends, for railroads not earning 110% will rationally file under section 10705a, whereas those earning 110% will file under pre-Staggers Act provisions. Congress continued the ICC's role as arbiter of the public interest in most joint-rate-cancellation cases, but carved out an exception to make cancellation of noncompensatory rates easier, accompanied by a "penalty clause"[14] for those who would misuse the exception.

## V. CONCLUSION

We agree with the ICC's construction of pre-Staggers Act law as granting it discretionary power over the suspension of joint rates.[15] Given this, it is clear that FLS could and did proceed under pre-Staggers Act law. Under a long line of decisions, *see supra* part II, the ICC's nonsuspension decision is unreviewably committed to agency discretion. We have no basis on which to overturn the ICC's decision. We affirm.

*So ordered.*

---

**14.** Commensurate with the less-than-grave nature of the infraction (invoking the wrong statutory section), the penalty imposed by § 10705a(c)(4) is but a temporary one. The ICC must, rather than may, suspend the tariff for consideration, but it may still approve it, after consideration, as being consistent with the "public interest" under § 10705(e).

**15.** Our holding also grants deference to the agency's interpretation of its governing statute. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).