**SEABOARD COAST LINE RAILROAD, et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Consolidated Rail Corporation, Intervenor.**

**No. 82–8172.**

United States Court of Appeals, Eleventh Circuit.

Feb. 13, 1984.

P. Brantley Davis, Atlanta, Ga., R. Eden Martin, Joseph B. Tompkins, Jr., Lawrence A. Miller, Washington, D.C., for petitioners.

Lawrence H. Richmond, Timm L. Abendroth, ICC, Kenneth P. Kolson, John J. Powers, III, Dept. of Justice, Washington, D.C., for respondents.

Charles N. Marshall, Bruce B. Wilson, Timothy T. Toole, Philadelphia, Pa., for intervenor Consol. Rail Corp.

Carl E. Sanders, Atlanta, Ga., for intervenor Southeastern Assoc. of Reg. Utility Com'n and Southern Governor's.

Before HATCHETT and CLARK, Circuit Judges, and SCOTT,* District Judge.

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

CLARK, Circuit Judge:

This controversy between Seaboard Coast Line Railroad Company and Consolidated Rail Corporation is based on a dispute over the division of the tariff charged for shipments of cereal from points in the northeastern section of the United States to points in the southeastern area. At stake is a much larger issue; the fixing of freight rail rates when the participating carriers cannot agree on the division of a rate and rail service is refused by a receiving carrier.

The determination of freight tariffs and their division between two or more carriers is a complex subject, and has a vocabulary all its own. To generate business, tariffs must be competitive with truck and barge carriers; to support the business, tariffs must be sufficient to pay the costs of the several railroad companies; and then the tariff must be divided amongst the participating carriers. The vast majority of tariffs are divided by agreement of the carriers. Very few are fixed by the Commission. A third method of division results when each carrier charges its individual tariff for its portion of the carriage.

The subject is complicated by passage in 1980 of significant changes in the law which deregulated the railroad transportation business.[1] The new legislation spawned two decisions by the Interstate Commerce Commission in 1980 and 1981 which arguably undermine the recent historical basis for the division of rates between northern and southern carriers serving the eastern half of the United States. As a result, Consolidated Rail Corporation (Conrail) unilaterally changed its tariff rate for the carriage of cereal products from points in the Northeast to Cincinnati, the freight gateway to the Southeast. This increased the amount of the tariff collected by Conrail on shipments going into the Southeast, thus altering the prior division of tariffs. In retaliation, Seaboard Coast Line Railroad Company (hereafter called Family Lines, the trade name of the group of railroad companies to which Seaboard belongs) entered into certain tariff agreements with other freight carriers in the Northeast for the carriage of cereal into the Southeast resulting in a competitive disadvantage to Conrail. The ICC directed Family Lines to cease certain of its anti-competitive practices and this appeal resulted.

*The Nature of the Involved Tariffs*

Some definition of rates is necessary, the most common rates being "local," "proportional," "joint," and "combination." Freight may move on the lines of only one railroad carrier or it may move over the lines of two or more interconnected railroads. The latter are interline shipments. Freight hauled solely on the lines of one carrier is known as "local" traffic and moves under so-called "local rates."

Traffic which moves via two or more interconnected railroads necessitates two or more companies sharing in the "through rate" tariff charged to the shipper. One way to establish and divide such tariffs is for the carriers to combine, or add up, the separate local or proportional rates of all of the carriers participating in such movements. These are called combination rates. They result generally from shipments over long distances and normally are too costly to compete with motor carriers and other rail carriers. This is a little used method of determining a tariff rate.

In order to be competitive, railroads generally do not make through rates by combining the applicable local rates of participating carriers; instead, through rates are made as joint rates—a single amount charged to shippers for the joint transportation services of all of the railroads participating in a through movement. It is the normal rule that joint rates are fixed by agreement of the participating carriers in the transportation chain and all carriers must agree. Pursuant to 49 U.S.C. § 10705, the Interstate Commerce Commission may prescribe joint rates and the division of the tariff amongst the carriers.

---

1. Particularly, 49 U.S.C. § 10101a (policy statement re regulating the railroad industry, with emphasis on maximizing competition and minimizing regulatory control); 49 U.S.C. § 10741(f)(4) (subparagraph (f) added exceptions to non-discrimination statute).

As a safety valve for fixing a tariff when the carriers cannot agree, they may establish a combination rate through the use of proportional rates. A proportional rate has the characteristic of a local rate in that it is unilaterally established by each carrier for the passage of the freight over its lines. However, proportional rates are limited to carriage of through freight and are lower than local rates. Used only in combination with a proportional or local rate of other carriers, this method permits railroads to arrive at a lower combination rate for through shipments and avoid the higher rate which would result from the combination of local rates.

When a proportional rate of one carrier is combined with the local or proportional rate of other carriers, they may become joint rates by virtue of a joint rate tariff provision known as an "aggregate of intermediates" rule which is mandated by 49 U.S.C. § 10726(a)(1)(B). This rule provides that if the combination of local and/or proportional rates applicable to a movement of freight between a particular origin and a particular destination over *any* route produces a *lower* through rate than the single-factor joint rate set forth in the tariff, shippers may only be charged the lower combination of rates, which becomes the joint rate over *all* routes between those two particular points.

In those instances where joint rates have not been fixed by agreement of the carriers or by the Commission, revenue arising from shipments are divided between carriers on the basis of "as made" or on the basis of "through percents." The division is a simple one when "as made" and results in each carrier being paid a share of the revenue collected depending upon its own local or proportional rate for the distance the freight is hauled. However, when a rate is lower than the total of the local or proportional rates as a result of the operation of the statutorily required "aggregate of intermediates" rule, the rate must be charged "through percents." Each carrier gets a percentage of the tariff either as agreed upon by them or as prescribed by the Inter-

state Commerce Commission. As previously stated, the "aggregate of intermediates" clause (49 U.S.C. § 10726(a)(1)(B)) makes it unlawful for carriers to charge a shipper a through rate that exceeds the aggregate of intermediate rates (*i.e.,* local or proportional rates) applying between the same points over the same routes. *See* 49 C.F.R. § 1300.56 and § 1300.200.[2]

### Historical Background

In order to understand the present litigation, it is necessary to review the history pertaining to the division of tariffs between carriers in the official territory (an area east of the Mississippi, north of a line extended along the northern line of the state of Virginia to the Ohio River and north of that river) and rail carriers in the southern territory (an area south of the official line and east of the Mississippi River). As a result of *Class Rate Investigation* starting in 1939 and first reported in 262 I.C.C. 447, the Commission found an inequitable rate structure between carriers in the official territory and the southern territory as a result of which the Commission established a "uniform divisional scale" which prorated divisions of tariffs primarily in accordance with the mileage hauled in each territory. *See New York v. United States,* 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947), and *Official-Southern Divisions,* 287 I.C.C. 497 (1953). The Commission had this authority pursuant to former 49 U.S.C. § 15(1)(6), now 49 U.S.C. § 10705(a)(1) (West U.S.C.A. 1983).

The commodity involved in this case, cereal, is the only one that has moved in significant quantities between official and southern territories on combination rates. As previously stated, combination rates, unlike joint rates, are determined by combining separate local or proportional rates of all the carriers participating in a through movement. Normally, combination rates divide as made; that is, each carrier independently prices the service on its portion

---

2. For example, freight moving from points A to D through points B and C cannot bear a tariff that exceeds the total of the local or proportional rates between points A to B, B to C, and C to D.

of the movement (the local or proportional rate) and receives that amount as its "division" of the total through combination rate. However, the 1953 Commission order, 287 I.C.C. 497, 547, included not only joint rates but combination rates.[3] The Commission order apportioned all rates on the basis of the mileage the freight was carried over each line. Thus, a carrier could receive as its share of the tariff more or less than its local or proportionate rate would otherwise entitle it to absent the Commission order.

Conrail was dissatisfied with this division of revenue because, under the division schedule, it did not receive all its rate that was used to make the combination rate. The amount Conrail received on a through movement was not determined by Conrail's pricing its own services over its own lines, but by the divisions formula rule in 287 I.C.C. 497, *supra.* As appellants have correctly noted, Conrail has long been dissatisfied with the division of revenue on much of its through service. Before the events of the present case, Conrail, seeking to improve its position, had attempted to impose surcharges on its portion of through movements of several commodities. In *Conrail Surcharge on Pulpboard,* 362 I.C.C. 740 (1980), the Commission found the surcharges unlawful and ordered them canceled. Nonetheless, the Commission "sought other ways in which ConRail could ameliorate its joint rate problems." *Consolidated Rail Corporation—Petition To Eliminate Docket No. 28300,* 364 I.C.C. 316–17 (1981).

The Commission took action that facilitated rate structure changes by Conrail. Family Lines responded to those changes by actions we will later discuss and which form the issue we must decide.

First, in *Conrail Surcharge on Pulpboard,* 362 I.C.C. 740 (1980), the Commission eliminated the divisions prescription for north-

south traffic (p. 1609, *supra*) insofar as combination rates are concerned. The Commission wrote:

If ConRail, or any other carrier, were to cancel its participation in joint north-south commodity rates, the prescribed north-south class rate would then be applicable. The publication by ConRail of proportional or local rates between northern points and north-south gateways for use in constructing a through combination rate would be meaningless absent some authority for the combination rate to replace the class rate.

. . . . .

The problem arises with the division of the combination rate. In *Official-Southern Divisions, supra,* the Commission found that the divisions of both joint class and commodity rates between the northern and southern carriers were unjust and unreasonable, and prescribed new divisions. However, the Commission included language in parentheses (287 I.C.C. at 547, and 289 I.C.C. at 9) which made the new divisions applicable to any aggregate of intermediate rates which would displace the joint class or commodity rate.

. . . . .

ConRail has requested, in a petition filed March 21, 1980, that the Commission modify its *Official-Southern Divisions* order by eliminating the language making the substituted combination rates subject to the divisions order, as to allow them to retain fully the revenue on its local or proportional rate . . . .

*Conrail Surcharge on Pulpboard,* 362 I.C.C. at 750–51. Thus, the Commission ordered:

The language in parentheses[4] in the findings of *Official-Southern Divisions,*

---

3. The language at 287 I.C.C. 547 in parentheses is what we refer to as "combination rates" in the text:

2. We find that except as hereinafter provided, just, reasonable, and equitable primary divisions of the rates referred to in finding 1 (including aggregates of intermediate rates which automatically displace single-factor joint rates) would be determined by use of the prorating factors set forth in column 1 of

the appendix in computing percentages expressed as integers, the factor for the northern line or lines being that shown in column 1 for the short-line distance north of the dividing point and the factor for the southern line or lines being that shown in column 1 for the short-line distance south of the dividing point.

4. *See* note 3 (footnote not in original).

287 I.C.C. 497, 547 (1953), 289 I.C.C. 4, 9 (1953), 325 I.C.C. 1, 51 (1965), and 337 I.C.C. 74, 95 (1970), which includes aggregate of intermediate rates which automatically displace single-factor rates in the divisions prescription, is deleted.

*Conrail Surcharge on Pulpboard,* 362 I.C.C. at 755.

The second action taken by the Commission that bears on this case was its decision to cancel its prescribed class rates in *Consolidated Rail Corporation—Petition To Eliminate Docket No. 28300 Class Rate Prescription,* 364 I.C.C. 615 (1981). The Commission decided that the class rates need no longer be prescribed because they are virtually never used, except to frustrate the application of combination rates. 364 I.C.C. at 620. Not only did the class tariffs' open aggregate rule require division of combination rate revenue by through percents, but, further, the rule required that any lower combination rate due to a lowered intermediate rate be applied to routes other than one that the carrier had specifically in mind. By deprescribing the class rates, railroads gained the option to cancel class rates and thereby cancel the open aggregate rule contained within the class rate tariff.

Following these decisions, Conrail reduced its proportional rates on cereal to the South for specific, low-cost routes. It also canceled its participation in the applicable class rates. The open aggregate rule ceased to apply, which meant the rates divided as made and applied only to the routes on which they were published to apply. Under this arrangement, revenues of the southern lines would be equal to either their local or proportional rate, which could be adjusted unilaterally.[5]

We must note that although Family Lines filed objections in the ICC proceedings which deleted the provision for displacement of single-factor rates (362 I.C.C. 740, *supra*) and which eliminated class rates (364 I.C.C. 615, *supra*), Family Lines did not appeal the Commission's decisions. It is these two changes which opened the door to Conrail to change the division of rates between its line and Family Lines.

Family Lines responded to Conrail's action. First, Family Lines restricted its proportional rate in the South against use in combination with rates in the North. Its proportional rate could still be used by carriers in the West. Second, it canceled its local rates and published a single local rate from Cincinnati, Ohio that was restricted against use in combinations. Finally, it published new joint rates with the other carriers from Official Territory, thus restoring itself to the position it had held under the prior rate structure.

Conrail was offered the chance to concur in the new joint rates, but Conrail declined. Conrail's proportional rates were rendered useless because they lacked a rate with which to combine in the South.

### The Commission's Decision

On November 12, 1980, Conrail filed a complaint with the Commission challenging the Family Lines' tariff actions. Conrail challenged the refusal of Family Lines to do business with it except as a joint enterprise controlled by Family Lines. The

5. The following hypothetical example illustrates the effects of Conrail's tariff publications. Assume a carload movement of cereal products originating on Conrail in the North and moving 300 miles via Conrail to point of interchange with Family Lines, and thence moving 300 miles via Family Lines to a destination in the South. Assume further that the rate applicable to this movement was a single-factor rate of $1,000. The total joint rate of $1,000 would be divided on the equal-factor divisions basis for North-South traffic prescribed in Docket No. 29885 (287 I.C.C. 497), and the divisions of Conrail and Family Lines would therefore each be $500.

Now assume that Conrail lowers its proportional rate from $650 to $550 and that Family Lines' local rate is $400. Because the combination rate has now fallen from $1,050 to $950, from $50 above the joint rate to $50 below it, the combination rate is now applicable under the open aggregate rule. If the through rate is now divided as made, Conrail will collect the amount of its new proportional rate ($550); similarly, Family Lines will collect the amount of their proportional rate ($400) with which the new Conrail proportional would combine. Hence, Conrail would realize $50 more than it received from equal-factor division of the multi-factor joint rate of $1,000, and Family Lines would receive $100 less.

Commission's administrative law judge dismissed Conrail's complaint. On appeal, the Commission, with one commissioner dissenting, reversed the ALJ. The Commission found that Family Lines' tariff publications created unlawful discrimination under 49 U.S.C. § 10741(a) [6] because (1) the restrictions on their proportional rates "permit western carriers to use those rates ... but do not permit northern carriers, including Conrail, to use those rates," and (2) the restrictions on their local rates denied Conrail the opportunity to form a through rate by combining its proportionate rate with Family Lines' local rate. Further, the Commission found that Family Lines' actions violated 49 U.S.C. § 10101a by inhibiting competition among carriers in Official Territory. Competition would be inhibited because Conrail would either have to enter into Family Lines' joint rates on the same basis offered all other Official Territory carriers, or cede its traffic to those other carriers.

*Family Lines' Assertion that the Case is a Divisions Dispute*

Family Lines begins its argument on appeal not by addressing the legitimacy of its own rates, which were the subject of Conrail's challenge initiating this case, but rather by attacking the legitimacy of Conrail's rates and the Commission's facilitation of those rates. We previously have noted that Family Lines did not appeal either the Commission's *Docket No. 28300* decision (364 I.C.C. 615) or the relevant parts of its *Surcharge on Pulpboard* order (362 I.C.C. 740), and failed to directly challenge Conrail's rates when they were published. Nonetheless, we now examine Family Lines' assertions as to the legitimacy of Conrail's and the Commission's actions.

Family Lines asserts that the Commission erred in failing to treat this case as a dispute over equal divisions of joint rates. Family Lines then claims that the Commission changed division of joint rate revenue without complying with the joint rate divisions statute, 49 U.S.C. § 10705, and the 1953 divisions prescription in *Official-Southern Divisions*. Family Lines argues, "Conrail sought unilaterally to change the character of the applicable rates from joint to non-joint proportional rates." Appellants' brief at 28–29.

To make these arguments, Family Lines obviously must first contend that these cereal rates, which Conrail emphasizes have always been combination rates, have really been joint rates. Family Lines in effect argues that under the 1953 divisions prescription, combination rates came to be considered as joint rates because the decision explicitly applied the joint rate division formula to them. Family Lines cites *Aberdeen & Rockfish R. Co. v. United States,* 565 F.2d 327 (5th Cir.1977), to argue that the action of the Commission and Conrail involves "*in economic terms* a change in the joint rates and divisions thereof." 565 F.2d at 335 (emphasis added). In *Aberdeen & Rockfish,* the Commission had approved the Long Island Railroad's unilateral surcharge imposed on joint rates as an "add-on charge." The Fifth Circuit reversed the Commission, rejecting as unrealistic "in economic terms" the reasoning that this add-on was not a change of joint rates. Family Lines attempts a long step from *Aberdeen & Rockfish* to argue that the combination rates in the present case are in economic reality joint rates.

However, the analysis which made sense in *Aberdeen & Rockfish* does not apply in the present case. Although the Commission's parenthetical language in the 1953 divisions prescription required combination

---

**6.** A common carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may not charge or receive from a person a different compensation (by using a special rate, rebate, drawback, or another means) for a service rendered, or to be rendered, in transportation the carrier may perform under this subtitle than it charges or receives from another person for performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances. A common carrier that charges or receives such a different compensation for that service unreasonably discriminates.

49 U.S.C. § 10741(a).

rates to be divided not "as made" but by through percents, combination rates have remained distinguishable from joint rates. Combination rates are not unitary as joint rates are. Rather, combination rates are aggregates of proportional and local rates which each railroad can establish unilaterally, instead of jointly. Rather than being joint rates, combination rates displace joint rates under the open aggregates rule.

■ Family Lines focuses on the 1953 *Official-Southern Divisions* decision when it argues that the combination rates in question are in economic reality joint rates. Besides that decision, there was, as noted above, a second reason that revenue from the combination rates was divided by through percents and not "as made." That other reason was that the combination rates were subject to the open aggregate rule contained in the class rates tariff. Conrail, in taking its rate action, did cancel the class rates tariff. This cancellation was facilitated by the Commission in its *Petition to Eliminate Docket No. 28300 Class Rate Prescription* decision, 364 I.C.C. 615 (1981). With the cancellation of the tariff, the open aggregates rule too is canceled. If the *Official-Southern Divisions* decision transformed combination rates into joint rates for all purposes, then the open aggregates rule should do the same. But the open aggregates rule does not. Just as that rule can be canceled without leaving combination rates permanently transformed, so too can the other hindrance to division of combination rate revenue "as made" be "canceled." A railroad can cancel a joint rate without obtaining the approval of interconnected carriers or pursuing a particular statutory cancellation procedure. *Southern Ry. Co. v. I.C.C.*, 681 F.2d 29 (D.C.Cir.1982).

■ Family Lines did not challenge Conrail's class rate cancellation in 364 I.C.C. 615, perhaps because Southern Railway Company had failed in challenging a joint rate cancellation (by Family Lines) in *Southern Ry. Co. v. I.C.C.* The details of the class rate cancellation have not been made clear by the parties. Nonetheless,

Family Lines' arguments that combination rates were transformed into joint rates by the 1953 divisions decision carries no greater weight than the argument that the class rates tariff's open aggregate rule transformed them.

### Whether Family Lines' Rates Discriminate Against Conrail in Violation of 49 U.S.C. § 10741(a)

The Commission found that Conrail established a violation of section 10741(a) (formerly section 2) because Family Lines' restrictions on their own proportional and local rates applied only to Official Territory carriers (including Conrail) and not to other carriers, for example, those in Western Territory. Thus, only Official Territory carriers were barred from constructing combination rates into the South.

■ Family Lines argues that the different treatment for carriers of the different territories is permissible under the statute. Family Lines challenges the Commission's discrimination findings on two bases. First, it argues that the rates are "applicable to different routes," precluding a discrimination finding in light of 49 U.S.C. § 10741(f).[7] Second, it argues that the Commission failed to consider factors other than the cost of service.

These arguments lack merit. The rail rates at issue are rates charged by Family Lines on its route into the South from the gateway in Cincinnati. These are not "different routes" and thus subsection 4 of § 10741(f) is inapplicable. Family Lines asserts that traffic carried from Buffalo to Cincinnati (Family Lines' gateway) to Atlanta is a different route from the route from Omaha to Cincinnati to Atlanta. Family Lines then reasons that it can charge a higher rate for Conrail's shipment on the Cincinnati to Atlanta portion of the route than it charges the carrier who transported grain from Omaha to Cincinnati.

We reject this argument for two reasons. First, that interpretation flies in the face of § 10741(a) to which subsection (f) is an

7. (f) This section shall not apply to—

. . . . .

(4) rail rates applicable to different routes; 49 U.S.C. § 10741(f)(4).

exception, subsection (a) reading in part as follows:

(a) A common carrier ... may not charge or receive from a person a different compensation (by using a special rate, rebate, drawback, or another means) for a service rendered ... than it charges or receives from another person for performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances ....

49 U.S.C. § 10741(a). For Family Lines to charge Conrail a higher compensation for the same service rendered, transportation of grain from Cincinnati to Atlanta, would be a violation of the thrust of this statute. To apply the "different route" exception here would permit carriers to favor one carrier over another which appears to be forbidden by the statute. Also, such a power to charge different rates would permit anticompetitive combinations between railroads who could put a competing carrier out of business by charging higher rates as Family Lines attempts here.

Still a second reason for not accepting Family Lines' interpretation of the statute, is our reading of subsection (e) to section 10741 and subsection (3) of subsection (f) of section 10741. These sections along with 49 U.S.C. § 10728 authorize carriers to charge different rates, and to have different classifications, rules and practices if different or distinct services are provided as described in § 10728 and subsections (e) and (f)(3). The reason to except "rail rates applicable to different routes" is that this contemplates a situation where costs are different. The new railroad legislation passed by Congress has many purposes. One of the chief ones is to permit a revival of the railroad industry which had suffered considerably from motor and airline competition and from an antiquated rate structure. Congress intended for the railroads to have the privilege of charging different rates where different and distinct costs and routes were involved to enable the railroads both to compete and to recoup their costs of doing business.[8]

Similarly, the charge that the Commission failed to consider factors other than the cost of service miscarries because Family Lines did not present evidence of factors touching upon these shipments which would justify some change in the rate. The cases relied upon by Family Lines involved shipments which would go forward by rail carriage if a lower rate were charged to meet competition from another form of transportation, such as motor carrier.[9]

---

**8.** The congressional history pertaining to Pub.L. No. 96–448 supports our conclusion. The House report states:

This section amends 49 U.S.C. 10741 to state that rates, rules, or practices which are economically justified by differences in costs or market demand do not constitute a violation of this section. The new subsection (f) is intended to narrow the scope of Section 10741 by exempting surcharges, contract rates, separate rates for distinct services, rail rates applicable to *different routes between the same end points* and customer solicitation expenses. The Committee considers *"end points" to mean specific origins and destinations* and broad geographic areas encompassing origins and destinations contained within particular or general tariffs.

Subsections (e) and (f) narrow Section 10741 by permitting discrimination among "different services". The term "different services" is intended to recognize any differences that would normally be recognized in unregulated service industries as constituting a basis for price differences which would not have an adverse effect on competition.

1980 U.S.Code Cong. & Ad.News (94 Stat.) 3978, 4004–05 (emphasis added). The Conference Committee substitute report states:

The Conference substitute adopts the House amendment.... The conferees also expect the Commission to exercise its remaining power under section 10741 only where it is needed to prevent abuses of market power where discrimination cannot be justified by differences in demand for services or costs.

*Id.* at 4136.

**9.** In *Texas & Pacific Railway v. I.C.C.*, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896), the railroad offered European shippers a rate lower than that offered American shippers to ship an identical product along an identical route. This was justified because the European shippers had available lower cost water transportation. In *Barringer & Co. v. United States*, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943), the rail companies offered shippers of cotton from Oklahoma to the Gulf states rates lower than those offered to shippers of cotton from Oklahoma to the southeastern states. This was

If there are circumstances or conditions that render services unlike or dissimilar or otherwise justify a rate disparity, the burden is on the carrier charged with the discrimination to present such evidence. *Harvest House Marketing v. Green Bay & Western R.R.,* 358 I.C.C. 531 (1978). Family Lines produced no evidence of other factors to justify the rate disparity. For example, there was no suggestion that western carriers faced greater competition than Official Territory carriers.

The Supreme Court in 1947 decided a very similar issue contrary to the position argued by Family Lines. In *I.C.C. v. Mechling,* 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947), Justice Black wrote that rates for shipment from the "rate-break point" of Chicago could not discriminate against ex-barge grain unless the eastern haul of ex-barge grain cost eastern railroads more to haul. In *Mechling,* the railroads transporting grain from Chicago to eastern destinations charged a higher tariff for shipments received from barge carriers than for those received from rail carriers. This favored the rail carriers in the Western Territory over barge carriers, notwithstanding the fact that the cost to the rail carrier was the same regardless of whether the forwarding carrier was a barge line or a railroad.

Therefore, in the present case, Family Lines' rates for shipments from a gateway —"rate-break point"—into Southern Territory, in which it operates, cannot discriminate against Official Territory carriers in offering intermediate rates for combination, because the cost of service to Official Territory carriers is no different than the cost of service to carriers of other territories. Our focus is upon the routes from the Family Lines gateway. Family Lines has its own discrete rates for such routes. Despite the disparate origins of traffic arriving at the Family Lines gateway, it travels along the same Family Lines routes. Therefore, 49 U.S.C. § 10741(f)(4) does not apply in this case and Family Lines must offer the same rates and conditions to all

carriers tendering its shipments at the gateway.

### Effect of Congressional Policy Statement

Family Lines' final argument is that the Commission erred in finding that its tariffs were anti-competitive in violation of the National Rail Transportation Policy set forth in 49 U.S.C. § 10101a. The argument is two-pronged. One is that this section does not create an independent basis for Commission action, and the second is that the acts of Family Lines were not anti-competitive. The Commission in its decision in this case, 365 I.C.C. 330, 335, recited that Conrail had charged Family Lines with violating subsections (1), (2), and (13) of the policy statement:

> In regulating the railroad industry, it is the policy of the United States Government—
>
> > (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
> >
> > (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
>
> .    .    .    .    .
>
> > (13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

49 U.S.C. §§ 10101a(1), (2), and (13).

The Commission then proceeded on page 336 of its opinion to find that Family Lines' discrimination against Conrail has hindered competition in that Conrail was denied the right to make a combination rate for the transportation of cereal from points on its line to points in the South served by Family Lines.

There can be no doubt that the actions of Family Lines inhibited competition. The combination of Conrail's proportionate rate with that of Family Lines' proportionate rate resulted in a lower transportation rate

justified by the fact that along the Gulf route there was cheaper truck competition.

than the joint rate proposed by Family Lines. Family Lines makes a considerable argument that "the Family Lines have not unlawfully discriminated against Conrail, which has been treated in precisely the same manner as its northern competitors." (Family Lines brief, p. 54). Conrail did not want to be treated in precisely the same manner as its northern competitors. It wanted to have the advantage of Family Lines' lowest published rate and to compete more aggressively against Conrail's northern competitors. This was prevented by Family Lines creating a rate structure which prevented Conrail from making a combination rate as previously mentioned. Thus, we agree with the Commission that Family Lines' actions were anti-competitive.

Family Lines submits no legal authorities in support of its argument that the statute setting forth the policy of the United States in the regulation of the railroad industry cannot be the basis of a legal conclusion of the Commission. It is unnecessary for us to decide whether the policy statement is substantive law. The Supreme Court has stated:

The National Transportation Policy, formulated by Congress, specifies in its terms that it is to govern the Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured.

*Schaffer Transportation Company v. United States,* 355 U.S. 83, 87–88, 78 S.Ct. 173, 176, 2 L.Ed.2d 117, 120–21 (1957) (footnote omitted). *See also I.C.C. v. New York, New Haven & Hartford R. Co.,* 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963), and *American Commercial Lines, Inc. v. Louisville & N.R. Co.,* 392 U.S. 571, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968).

Family Lines argues at page 49 of its brief, in referring to § 10101a, "that section clearly does not create an *independent basis* for Commission action in the absence of any violation of the substantive prohibitions of the Interstate Commerce Act." There was a violation by Family Lines of 49 U.S.C. § 10701 and 49 U.S.C. § 10741 which pro-

hibit a carrier from discriminating "in its rates against a connecting line of another carrier" (§ 10701(c)); and which prohibit discrimination in that a carrier "may not charge or receive from a person a different compensation ... for a service rendered ... than it charges or receives from another person for" a like service. (§ 10741(a)).

Since the Commission found, and we agree, that Family Lines violated substantive prohibitions of the Act, it follows that the Commission did not err in finding that such violations were contrary to the policy established by Congress.

### Conclusion

The law in this area is rather simple. A carrier must offer its transportation services to customers and other carriers at the same rate or tariff, unless the carrier can make a showing of valid reasons for a higher or lower tariff. 49 U.S.C. § 10741(a); *Mechling, supra,* and cases cited at note 8. Family Lines only advances one reason— that the Commission failed to enforce its 1953 order in *Official-Southern Divisions,* 287 I.C.C. 497. But appellant in so arguing refuses to accept the changes made by the Commission in its decisions in *Conrail Surcharge on Pulpboard,* 362 I.C.C. 740 (1980), and *Consolidated Rail Corporation—Petition To Eliminate Docket No. 28300,* 364 I.C.C. 316 (1981). Appellant was a party to each of those proceedings and failed to appeal. Additionally, by its litigation with Southern Railway as mentioned *supra* at p. 19, appellant undercut its position with respect to the right of a carrier to cancel class rates, one of the steps taken by Conrail. Concluding that the Commission was correct, its decision is

AFFIRMED.