# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 10, 2006       Decided May 26, 2006

No. 04-1343

FRONTIER PIPELINE COMPANY AND EXPRESS PIPELINE LLC,
PETITIONERS

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

BIG WEST OIL, ET AL.,
INTERVENORS

---

Consolidated with
04-1344 and 04-1349

---

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

---

In Nos. 04-1343 and 04-1349, *Steven Reed* argued the cause for petitioners Frontier Pipeline Company and Express Pipeline LLC. With him on the briefs were *Steven H. Brose, John D. Clopper,* and *Christopher J. Barr*.

In No. 04-1344, *Melvin Goldstein* argued the cause and filed the briefs for petitioners Big West Oil, LLC and Chevron Products Company.

In Nos. 04-1343, 04-1344, and 04-1349, *Judith A. Albert*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Thomas O. Barnett*, Acting Assistant Attorney General, U.S. Department of Justice, *John J. Powers* and *Robert J. Wiggers*, Attorneys, and *John S. Moot*, General Counsel, Federal Energy Regulatory Commission, and *Dennis Lane*, Former Solicitor.

In Nos. 04-1343 and 04-1349, *Melvin Goldstein* was on the brief of intervenors Big West Oil, LLC and Chevron Products Company.

In No. 04-1344, *Steven H. Brose*, *Steven Reed*, *John D. Clopper*, and *Christopher J. Barr* were on the brief of intervenors Frontier Pipeline Company and Express Pipeline LLC. *Dawn M. Karolick* entered an appearance.

Before: GARLAND, *Circuit Judge*, and SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Before us are petitions for review of orders of the Federal Energy Regulatory Commission requiring certain crude oil carriers to pay shippers reparations for excessive rates. The carrier-petitioners contend that FERC went too far, in holding that a joint rate exceeds the just and reasonable rate simply on the basis of a finding about the costs for providing service on *one* of four segments, where the Commission has denied the carrier any opportunity to show that the *overall* rate did not exceed costs. The shipper-petitioners contend that FERC didn't go far enough, in awarding reparations only for complaining shippers in privity with the carrier. We grant the carriers' petition, deny the shippers', and remand the case.

## I. The Carriers' Petition

### A. Background

We first explain the regulatory framework for oil pipelines, as well as some shipping terms.

Congress passed the Interstate Commerce Act ("ICA") in 1887 to regulate railroads, also creating the Interstate Commerce Commission to administer the statute. Ch. 104, 24 Stat. 379. In 1906, it declared the ICA applicable to oil pipelines and correspondingly expanded the ICC's jurisdiction. Hepburn Act, Pub. L. No. 59-337, § 1, 34 Stat. 584, 584. In 1977, it transferred the ICC's authority over oil pipelines to the newly created FERC, Department of Energy Reorganization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584 (codified in substance at 49 U.S.C. § 60502), and the next year provided that oil pipelines were to be regulated under the version of the ICA that prevailed on October 1, 1977, Act of Oct. 17, 1978, Pub. L. 95-473, § 4(c), 92 Stat. 1337, 1470. Accordingly, all references to the ICA in this opinion are to the 1977 version, which can be found in 49 U.S.C. § 1 *et seq.* (1976), reprinted in 49 U.S.C. app. § 1 *et seq.* (1988). The parties agree that decisions of the ICC applying the ICA prior to the 1977 legislation are treated as if they were FERC decisions; i.e., if FERC deviates from such a decision, it must at least justify the deviation as it would a deviation from a decision of its own under *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

ICA § 1(5), 49 U.S.C. app. § 1(5) (1988), requires all rates to be "just and reasonable" and declares all "unjust and unreasonable" rates to be "unlawful." The statute allows a shipper to challenge as unreasonable any rate, whether already filed and applicable, ICA § 13(1), 49 U.S.C. app. § 13(1) (1988), or newly filed, ICA § 15(7), 49 U.S.C. app. § 15(7)

(1988). From the dawn of federal oil pipeline regulation in 1906 up to the 1990s, the relevant agencies decided the reasonableness of a rate mainly on the basis of the pipeline's individual costs. See *Association of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1428-29 (D.C. Cir. 1996) ("*AOPL*"); *Farmers Union Central Exchange v. FERC*, 734 F.2d 1486, 1495-96 (D.C. Cir. 1984); *Farmers Union Central Exchange v. FERC*, 584 F.2d 408, 412-22 (D.C. Cir. 1978).

In 1992 Congress adopted the Energy Policy Act ("EPAct"), instructing FERC to issue, within one year of the statute's enactment, a "final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5)." Pub. L. No. 102-486, § 1801(a), 106 Stat. 2776, 3010, codified at 42 U.S.C. 7172 note. FERC carried out this mandate by issuing Order No. 561, *Revision to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, FERC Stats. & Regs. ¶ 30,985, 58 Fed. Reg. 58,753 (1993), *order on reh'g*, Order No. 561-A, FERC Stats. & Regs. ¶ 31,000, 59 Fed. Reg. 40,243 (1994), *aff'd*, *AOPL*, 83 F.3d 1424.

Order No. 561 adopts a rate cap system, under which ceiling levels for pipeline rates are adjusted annually on the basis of a formula predicting annual percentage changes in industry-wide pipeline costs. This system dispenses with intricate calculations of specific pipeline costs. Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,946-56, 58 Fed. Reg. at 58,757/2-63/1. Further, whereas fixing rate maximums on the basis of individual pipelines' costs tended to deter pipelines from adopting cost-reducing innovations (as the regulators would ultimately catch up with any cost reduction and lower the ceiling), the new system counters this tendency; a single pipeline's cost reduction is unlikely to much affect the industry-wide index. See *Flying J, Inc. v. FERC*, 363 F.3d 495, 496-97 (D.C. Cir. 2004).

Under the order, a carrier calculates a ceiling level at the start of each index year (which runs from July 1 to June 30) by taking the ceiling level for the previous index year and adjusting it according to the formula. 18 C.F.R. § 342.3(c), (d). The original ceiling level from which this process begins is determined either by reference to the rate in effect on December 31, 1994 (which became the ceiling for the first six months of 1995), 18 C.F.R. § 342.3(d)(4); Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,953-54, 58 Fed. Reg. at 58,761/3, or, for service going into effect thereafter, the "initial rate" for such service, 18 C.F.R. § 342.3(d)(5). For such an "initial rate," the carrier can choose any figure it wants, so long as it gets the consent of at least one non-affiliated shipper and no other shipper protests; failing that, the pipeline must justify the initial rate on the basis of its individual costs. 18 C.F.R. § 342.2; Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,959-61, 58 Fed. Reg. at 58,765/1-65/3.

A pipeline may raise a rate *above* the resulting ceiling level, but only if (1) it shows a lack of market power or a "substantial divergence" between the ceiling level and its individual costs; or (2) all customers consent. 18 C.F.R. § 342.4; Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,956-59, 58 Fed. Reg. at 58,763/1-64/3; Order No. 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,106-07, 59 Fed. Reg. at 40,253/1-53/2. When a rate is changed by one of these methods, the new rate becomes the ceiling level for the index year in which the change occurs. 18 C.F.R. § 342.3(d)(5).

A rate increase that doesn't exceed the ceiling level takes effect with no additional showing from the carrier. 18 C.F.R. § 342.3(a). Further, shippers' challenges to rates that comply with the regime—including challenges under ICA § 15(7) to rate changes and under ICA § 13(1) to existing rates—are subject to special limits requiring the shipper to "allege

reasonable grounds for asserting" a "substantial" deviation between the challenged rate increase and the pipeline's cost increase (or between the whole rate and the pipeline's costs). 18 C.F.R. § 343.2(c)(1); Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,955-56 & n.74, 58 Fed. Reg. at 58,762/2-63/1 & n.74.[1]

This discussion of the EPAct is far from comprehensive. The statute contains at least one other major provision, known as the "grandfather clause," that confers special protections on rates that had been in effect one year prior to the statute's enactment (i.e., in effect on October 24, 1991) and hadn't been the subject of "protest, investigation, or complaint" during the intervening year. EPAct § 1803, 42 U.S.C. 7172 note; Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,966, 58 Fed. Reg. at 58,768/3-69/1. This grandfathering operates independently of the rate-sheltering provisions of Order No. 561. See 18 C.F.R. §§ 342.1, 342.3, 343.2(c)(1); Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,952 & n.56, 58 Fed. Reg. at 58,761/1 & n.56; see also Order No. 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,102-04, 59 Fed. Reg. at 40,250/3-52/1. If a filed rate protected by the grandfather clause exceeds its ceiling level, the statutory grandfathering trumps. 18 C.F.R. § 342.3(e). Here, the grandfather clause is inapplicable, since the parties agree that none of the rates at issue enjoys its protection. *Big West Oil Co. v. Frontier Pipeline Co.*, 95 FERC ¶ 61,229, at 61,794 (2001) ("*Second 2001 Order*"); *Big West Oil Co. v. Frontier*

---

[1] Challenges to an "initial rate" filed under 18 C.F.R. § 342.2 are not explicitly governed either by § 343.2(c)(1) or by the cited explanatory text from the Order, see, e.g., Order No. 561, FERC Stats. & Regs. ¶ 30,985, at 30,955, 58 Fed. Reg. at 58,762/3 (discussing application to "existing rates that are the product of indexing").

*Pipeline Co.*, 94 FERC ¶ 61,339, at 62,259 (2001) ("*First 2001 Order*").

We must also review some shipping terminology. As this court explained (in a case on railroads, whose terminology is the same as for oil pipelines):

> A *through route* is an arrangement, express or implied, that provides for the continuous movement of freight over the lines of two or more railroads. There are a variety of methods by which the railroads along a through route may price their services. If they establish a *joint rate*, shippers pay a specified rate for the shipment over the route and the revenue is divided among the railroads according to an agreed formula [i.e., by a contract among the carriers]. In the absence of a joint rate, shippers pay a "*combination rate*," which is simply the sum of the individual rates charged by those railroads on the through route. The individual rates which, when aggregated, produce the combination rate may be either *local rates*, applicable to any shipment between the relevant points served by the particular carrier, or *proportional rates*, applicable only to that carrier's portion of a through movement.
>
> A carrier on a through route that is priced by combination rate is free at any time to modify the local or proportional rate it charges for its portion of the through route, subject to whatever independent legal constraints restrict its choice of rates. By contrast, once a joint rate is established, no carrier may modify it without unanimous agreement from the other participating carriers . . . .

*Pittsburgh & Lake Erie Railroad Co. v. ICC*, 796 F.2d 1534, 1536-37 (D.C. Cir. 1986) (emphasis added); see also *Seaboard Coast Line Railroad v. United States*, 724 F.2d

1482, 1484-85 (11th Cir. 1984); *Commonwealth of Pennsylvania v. ICC*, 561 F.2d 278, 281-82 (D.C. Cir. 1977); *Metropolitan Edison Co. v. Conrail*, 5 I.C.C.2d 385, 402 (1989). The local or proportional rates covering the individual movements that constitute a through route are known as *intermediate rates* of that route. See *Seaboard Coast Line Railroad*, 724 F.2d at 1485.

A note about the above taxonomy: The either-or phraseology in the discussion of *local* and *proportional* rates is potentially misleading, since "local" describes both (1) a rate that applies only to local traffic, and (2) a rate that applies both to local and through traffic. For rates of the second type (to which all the intermediate rates in this case belong), the phrase "local and proportional," which occurs often in this proceeding's record, is technically inaccurate under the case law; but the phrase has the virtue of suggesting that the rates apply to both forms of traffic. Trusting that our explanation will prevent a misreading, we join FERC in following the typology of the case law, referring to those rates simply by the name "local."

## B. Facts of the Case

Each of the shippers, Big West Oil, LLC, and Chevron Products Company, owns a refinery in Salt Lake City, Utah. Both ship crude oil from the Canadian border to their respective refineries over a sequence of four separately owned pipelines—in order of usage: Express Pipeline, LLC, Frontier Pipeline Company, Anschutz Ranch East Pipeline, Inc., and Chevron Pipeline Company.

During the period in question, each of the four carriers published its own individual tariff—variously referred to as "local," "proportional," "local proportional," or "local and

proportional"—that offered the same rate for a movement from the origin of the carrier's individual segment to its terminus, regardless of whether the shipment itself started and ended at those points or went all the way from the border to Salt Lake City. In other words, each carrier was offering a single rate for its segment and wasn't exercising its option to charge through shippers a different rate from local shippers. Oral Arg. Tr. 49-50 (stating, without contradiction in the record excerpts presented to us or in statements of counsel, that each carrier had the right to publish a proportional rate different from the local rate, which right none of them exercised); see also *Second 2001 Order*, 95 FERC at 61,792; *First 2001 Order*, 94 FERC at 62,256-57. Thus, it was possible for a shipper to transport oil over the four successive segments by contracting separately with each of the four pipelines and paying each its rate. Oral Arg. Tr. 34-35, 41-42, 49-51; see also *Express Pipeline LLC*, 99 FERC ¶ 61,229, at PP 4, 8, pp. 61,950-51 & n.4 (2002) ("*Cancellation Order*"); Affidavit of Van Hoecke at 4.

In 1998 the four pipelines contracted among themselves to give through shippers a discount. Under the contract, Express published joint tariffs (known as the "Express joint tariffs") under which a shipment going all the way from the border to Salt Lake City would be charged a single joint rate, lower than the sum of the four local rates. *Cancellation Order*, 99 FERC at PP 2-4, pp. 61,949-50. (Technically, the tariffs offered multiple joint rates, which varied according to shipment characteristics that don't concern us, including grade of petroleum and term commitment. E.g., Express Pipeline Partnership Joint and Proportional Term Rate Tariff No. 21, Supp. 3.) Unlike the other three pipelines, Chevron Pipeline did not participate directly in the joint tariff agreement, though it apparently did so indirectly, through a side agreement with Frontier and Anschutz. *Cancellation Order*, 99 FERC at P 3, pp. 61,949-50.

The Express joint tariff proposals of 1998 complied with *Texaco Pipeline, Inc.*, 72 FERC ¶ 61,313 (1995), a FERC ruling on how it would evaluate joint rate proposals under the ceiling level regime, an issue not explicitly addressed in Order No. 561. Oral Arg. Tr. 14-15. In *Texaco*, FERC held that the ceiling level for such a rate "is the sum of the ceiling levels associated with individual tariff rates currently on file" for the individual movements making up the journey covered by the joint rate. 72 FERC at 62,310. The joint rate proposal's compliance with *Texaco* is no surprise, since the joint rate (as a matter of business) could not be greater than the sum of the local rates, and each local rate (as a matter of law) was required to be no greater than its corresponding ceiling level. As already mentioned, of course, a rate at or below its "ceiling" may still be found unjust and unreasonable if a shipper can meet the standard specified in Order No. 561.

## C. The FERC Proceedings

The present controversy began in January 2001, when Big West brought challenges to Frontier's and Anschutz's local tariffs, principally under ICA § 13(1), alleging that both were substantially out of proportion to the individual costs of the respective carriers and thus unreasonable under § 1(5). *First 2001 Order*, 94 FERC at 62,256-57. Further, Big West challenged the Express joint tariff as unreasonable under § 1(5), *First 2001 Order*, 94 FERC at 62,259, and included Express as a respondent, solely on the ground that Express (whose local rate the complaint didn't question) was, as a participant in the joint rate, jointly and severally liable for reparations arising from it, *id.* at 62,257; *Big West Oil Co. v. Frontier Pipeline Co.*, 95 FERC ¶ 61,281, at 61,986 (2001) ("*2001 Rehearing Order*").

On receiving the complaints, FERC reached the conclusion that Big West's evidence, although confined to the local rates of two of the pipelines providing the through service, could without more show the joint rate covering all four pipelines to be unreasonable. In rejecting the carriers' motions to dismiss, FERC acknowledged that Big West failed "to contest [i.e., to offer evidence against] the joint tariff rates in their entirety." *First 2001 Order*, 94 FERC at 62,259. FERC insisted, however, that this was not an obstacle to Big West's challenge to the joint tariffs, since the shipper was "disputing [the local] rates because they are used to determine the amount of joint rates." *Id*. We return later to the question what the phrase "used to determine" may have meant. If the ALJ found the local rate to be reasonable, FERC ruled, "it can be assumed that the subject Express joint rates meet the standard set forth in *Texaco*," but if the ALJ found the local rate to be unreasonable, then, "the Express joint rates must be recalculated in accordance with *Texaco*," *First 2001 Order*, 94 FERC at 62,260.

A month after Big West's complaints, Chevron Products brought essentially identical challenges to the same rates and included the same carriers as respondents. *Second 2001 Order*, 95 FERC at 61,792-93. Chevron Products' affiliate, Chevron Pipeline, was not a direct participant in the joint rate and was not included as a respondent in either complaint.

FERC consolidated Big West's and Chevron Products' complaints for the purpose of settlement procedures and ordered that, should those procedures fail, there would be two ALJ hearings: one for all challenges to Frontier's local tariff and one for all challenges to Anschutz's local tariff. *2001 Rehearing Order*, 95 FERC at 61,986; *Second 2001 Order*, 95 FERC at 61,794. As to the dispute over the joint rates, FERC adopted, for the purpose of all complaints, the same theory that it had originally adopted for Big West's complaints, the

only difference being that two local rates rather than one would be at issue. *Second 2001 Order*, 95 FERC at 61,793-94.

Because settlement procedures did not lead to an agreement, ALJ proceedings began; but soon afterward the shippers and Anschutz settled all pending issues, including the unreasonableness of the joint tariff insofar as it concerned Anschutz. The shippers and Frontier also reached a settlement during the ALJ hearing, covering reparations for past movements under the local Frontier tariff and a future reduction in the local and joint tariffs. But as to reparations for shipments under the joint tariffs, Frontier and the complainants agreed only that for the purpose of "calculating the reparations, *if any*," the just and reasonable rate for Frontier's local tariff for the relevant past period was "$0.57 for light petroleum," i.e., the only type of petroleum involved in the disputed shipments. Joint Stipulation of July 18, 2002 at 7 (emphasis added). The $0.57 was much less than the actual local rate charged in the period, which had been about $1.50.

In August 2002, Frontier submitted to FERC a compliance filing, arguing that it owed no reparations on the joint tariff. FERC rejected the filing in February 2004, concluding that the Express joint rate was unreasonable to the extent it exceeded "the sum of the applicable local rates, including the stipulated $0.57 per barrel for Frontier." *Big West Oil Co. v. Frontier Pipeline Co.*, 106 FERC ¶ 61,171, at P 17, p. 61,571 (2004) ("*Reparations Order*"). In other words, it calculated reparations as the difference between (1) the joint rate filed and actually charged and (2) the sum of (a) the stipulated rate for the Frontier segment and (b) the local rates on file for the reparations period for the remaining three segments. Frontier and Express requested rehearing, which FERC denied. *Big West Oil Co. v. Frontier Pipeline*

*Co.*, 108 FERC ¶ 61,183, at PP 8-53, pp. 62,097-62,105 (2004) ("*Rehearing Order*").

## D. Discussion

The crux of the carriers' petition is that FERC erred by rejecting their argument that although one of the intermediates of the route covered by the joint rate was unreasonable, (1) one or more of the *other* intermediates might well have been *below* their respective maximum reasonable levels (perhaps because of greater competition on those segments), such that (2) the depression of some of the intermediate rates might partly or completely offset the excessiveness of the others, meaning (3) the joint rate couldn't be condemned as unreasonable, at least not without considering the joint rate as a whole. The carriers say that FERC failed to explain why, under the ICA and EPAct, such an argument isn't valid.

We agree with the carriers that the Commission has failed to reconcile its finding that the joint rate was unreasonable under ICA § 1(5) with the Supreme Court's construction of that section. The first pertinent decision is *Louisville & Nashville Railroad Co. v. Sloss-Sheffield Steel & Iron Co.*, 269 U.S. 217 (1925). The Commission had found certain joint rates unreasonable, *id.* at 222, and, for shipments over a certain period, held one of the carriers (the only one for which the statute of limitations—as to that period—hadn't run) liable for the entire overcharge, *id.* at 230-31. The Court rejected that carrier's claim that it should be liable only for a portion of the excess commensurate with its share of the ICC's mandated prospective rate reduction. *Id.* at 231-34. Although this holding is not relevant here, the Court also specifically targeted the carrier's argument "that the joint through rates should be treated as if they were merely a combination of the full individual rates of the several carriers, because the rates in

question were in fact constructed by combining as factors the existing published proportional rates of the several carriers." *Id*. at 231. The Court found this irrelevant, explaining:

> The fact that the joint rate had been constructed out of existing proportional rates is not of legal significance. The rates complained of were not merely the aggregate of individual local or proportional rates customarily charged by the respective lines for the transportation included in the through routes. The rates in question were strictly joint through rates. Each through rate was complained of as a unit. . . . A single charge was made for the transportation from point of origin to point of destination.

*Id*. at 233. This passage may do no more than rule that carriers offering a joint rate cannot demand that it be treated as a combination rate (for joint and several liability purposes) just because it happens to equal the sum of the intermediates. But the Court went on:

> The division of the joint rate among the participating carriers is a matter which in no way concerns the shipper. *The shipper's only interest is that the joint rate be reasonable as a whole.* It may be unreasonable although each of the factors of which it is constructed was reasonable. *It may be reasonable although some of the factors, or of the divisions of the participants, were unreasonable.*

*Id*. at 234 (emphasis added).

To be sure, the local rates against which FERC here purports to judge the Express joint rate aren't "factors" (i.e., there's no evidence they have any functional relationship to the joint rate) or "divisions" (i.e., there's no evidence that they correspond to the portions of proceeds received by the various

participants). But *Sloss-Sheffield*'s apparent message—that the reasonableness of a joint rate is to be assessed as a whole rather than simply by reference to one of its segments (or, more generally, to fewer than all of its segments)—seems entirely applicable. Certainly FERC's orders made no effort to explain how local rates are any more suitable than factors or divisions as bases for judging the reasonableness of a joint rate.

The second case, *Great Northern Railway Co. v. Sullivan*, 294 U.S. 458 (1935), involved genuine combination rates, each being the sum of two proportional rates. *Id.* at 459-60. The ICC found the proportional rates applicable to one of the two segments to be unreasonable under § 1(5) and ordered the carrier on that segment to pay reparations for the excess. *Id.* at 461. The Commission made no finding as to the reasonableness of the overall combination rates (nor of the proportionals applicable to the other of the two segments); indeed, the shippers never denied that the aggregate charges were reasonable and could have been collected without liability if the carriers had "imposed the charges by means of 'joint' instead of the 'combination' through rates that they did establish." *Id*. at 461-62. Reversing the ICC, the Court concluded:

> [A]s to the shipments here involved the [petitioner's] proportional [rate] cannot be applied save as it is a part of the through rate. There was a single charge which, though based on the combination rate, was precisely the same in amount as if the rate had been jointly made. As shown by our decision in [*Sloss-Sheffield*], the division among connecting carriers of charges based on joint rates—those involved in that case were constructed out of existing proportionals—is no concern of the shipper. The proportionals here involved are but parts of a through rate and cannot be distinguished from divisions of a joint rate.

*The shipper's only interest is that the charge shall be reasonable as a whole*.

*Id*. at 463 (citations omitted) (emphasis added).

Addressing *Great Northern*, FERC said only:

> *Great Northern* is distinguishable from the instant case in that it addressed combination rates based on the sum of proportional rates, not on the sum of local rates. The Supreme Court explained the difference between the types of rates by stating, "A proportional differs from a local rate in that it covers only terminal service at place of receipt or at place of delivery but cannot, as does the local rate, cover both." [294 U.S. at 460.] The Court in *Great Northern* specifically recognized that there was no applicable joint rate at issue. [*Id.* at 460-61.]

*Rehearing Order*, 108 FERC at P 42, p. 62,103 (footnotes omitted).

The Commission's closing sentence seems to have things exactly backwards. The Court rejected liability because, for purposes of the principle that a through rate could only be judged as an aggregate, it saw no material difference between a joint rate (*clearly* to be judged only as an aggregate) and a combination rate (by extension, also to be judged only as an aggregate).

Further, the Commission's implicit description of the joint rate here as "based . . . on the sum of local rates" is hard to make sense of. Earlier, in rejecting the carriers' motions to dismiss, FERC used a similar formulation, explaining its indifference to the costs on the unchallenged segments by asserting that Big West was "disputing [the local] rates because they are *used to determine* the amount of joint rates." *First 2001 Order*, 94 FERC at 62,259 (emphasis added). But

nothing in the orders, statements of counsel, or the record excerpts presented to us suggests that the joint rate was "based on" the sum of the local rates or that the local rates were "used to determine" the joint rate—except in the very general sense that the business rationale for the joint rate was to provide a discount from the locals. And even if the joint rate *were* somehow calculated "based on" the sum of the locals, reliance on *one* local rate to condemn the joint rate would seem to violate *Sloss-Sheffield*'s instruction not to use less than all the "factors" constituting a rate to judge the whole.

Perhaps FERC means to read *Great Northern* as saying only that a through rate should not be judged against the sum of *proportionals*, a reading that might leave the Commission free to judge a joint rate against the sum of *locals*. But it's hard to see why locals wouldn't be just as problematic as proportionals when employed as yardsticks to measure the reasonableness of a through rate. If the carrier offers local rates but not proportional rates (i.e., its rates don't vary based on local versus through service), as each carrier did here, then from the perspective of the through shipper, the local rates are functionally identical to the proportional rates in *Great Northern*. Alternatively, if the carrier charges different rates to local shippers and through shippers, the result is merely to render the local rates *irrelevant* from the perspective of the through shipper. It's also unclear why *Great Northern*'s admonition against judging a combination rate on the basis of one unreasonable intermediate wouldn't apply with equal force to judging a joint rate in the same way (particularly in light of *Sloss-Sheffield*). The basic principle—that variations in competition may produce lower-than-"reasonable" rates on particular segments, so that in defending a through rate a carrier must be free to show that its average costs were higher for that segment than the rate it charged the segment customers—would seem applicable. FERC's orders say nothing about this.

On the proportional-local distinction, FERC counsel attempted an answer at oral argument: the joint-rate shippers during the period in question had the *option* to ship under the local rates, and if Frontier's local rate hadn't been unreasonably high, the sum of the locals would have been lower than the joint rate, and the shippers therefore would have exercised their option. Thus, counsel urged, FERC should now award reparations as if things had unfolded that way. Oral Arg. Tr. at 34-35, 37, 41-42. The factual existence of the shippers' option appears undisputed. But the orders presently under review never even mention the option, much less rely on it to distinguish *Great Northern*. Under *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), accordingly, we cannot entertain the argument.

Besides failing to distinguish *Sloss-Sheffield* and *Great Northern*, FERC's order departs from the ICC's long-standing principle that under § 1(5) a through rate exceeding the sum of the intermediate rates is only rebuttably (not conclusively) presumed unreasonable. *Patterson v. Louisville & Nashville Railroad Co.*, 269 U.S. 1, 10 n.2 (1925) (citing numerous ICC cases); *Moore Bros. v. Chicago, Burlington, & Quincy Railroad Co.*, 210 I.C.C. 95, 99 (1935); *Michigan Buggy Co. v. Grand Rapids & Indiana Railway Co.*, 15 I.C.C. 297, 299 (1909). The ICC's approach received the Supreme Court's endorsement in *Patterson*, a case about the interplay between § 1(5) and another section of the ICA, § 4(1), 49 U.S.C. app. § 4(1) (1988). ICA § 4 originally consisted solely of the "short-haul/long-haul clause" (forbidding a carrier "to charge . . . any greater compensation in the aggregate . . . for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance") plus a provision authorizing the Commission to grant relief from the clause upon application by a carrier. Ch. 104, 24 Stat. 379, 380 (1887). Later, in 1910, *after* the Commission had already established the presumption that a

through rate exceeding the sum of the intermediate rates *presumptively* violated the reasonableness requirement of § 1, e.g., *Michigan Buggy*, 15 I.C.C. at 299, Congress amended § 4 by adding the so-called "aggregate-of-intermediates clause," making it unlawful for a carrier "to charge any greater compensation as a through rate than the aggregate of the intermediate rates." Act of June 18, 1910, Pub. L. No. 61-218, § 8, 36 Stat. 539, 547. (In 1920, Congress divided certain sections of the ICA into subsections; the reasonableness requirement of § 1 ended up in § 1(5), and all the § 4 provisions discussed above ended up in § 4(1). Transportation Act of 1920, Pub. L. No. 66-152, § 400, 41 Stat. 456, 474-75, § 406, 41 Stat. at 480.) In *Patterson* the shippers argued that the relief clause must not apply to the aggregate-of-intermediates clause, in part because such an application (they said) would effectively roll back shippers' rights, i.e., the ICC, whenever it granted relief from the aggregate-of-intermediates clause, would no longer apply *any* presumption of unreasonableness. 269 U.S. at 9-10 & n.2. The Court said this fear was unfounded: the ICC would continue—indeed *should* continue—to hold a through rate exceeding the sum of intermediates to be presumptively unreasonable under § 1(5) regardless of the aggregate-of-intermediates clause or any exemptions to it:

> The [ICC] is correct in holding . . . that if a through rate higher than the aggregate of the intermediates is attacked under [ICA] § 1, the *prima facie* presumption that such higher through rate is unreasonable, and hence unlawful, obtains now as it did before the 1910 amendment [i.e., the addition of the aggregate-of-intermediates clause to § 4]. But no such question could arise in a proceeding limited to § 4. In a proceeding for violation of either clause of § 4 [including the aggregate-of-intermediates clause], there is no occasion to consider either the presumption of unreasonableness or the existence of a justification for

making the through rate higher. Neither is relevant. For if there has been an adequate and timely application within the six months,[2] which application remains undetermined—or an application filed later and granted—there can be no violation of that section. If there was no such application filed, the section is violated by the higher through rate, even if conditions are shown which would have justified the rate as against a charge of unreasonableness under § 1.

*Id*. at 12. The Court ultimately held that § 4(1)'s relief clause embraced the aggregate-of-intermediates rule as well as the short-haul/long-haul provision. *Id*. Its reasoning in support of that holding treated one principle of § 1(5)'s application to a through rate as a given: in making a case of unreasonableness, shippers could shift the burden of proof to the carrier by showing that the through rate exceeded the sum of the filed intermediate rates, at which point the carrier could prevail by showing a "justification" of the excess.

---

[2] This is evidently a reference to yet another clause in § 4, enacted in 1910 simultaneously with the aggregate-of-intermediates clause, Act of June 18, 1910, Pub. L. No. 61-218, § 8, 36 Stat. 539, 548, providing that "no rates or charges lawfully existing at the time of the passage of this amendatory Act shall be required to be changed by reason of the provisions of this section prior to the expiration of six months after the passage of this Act, nor in any case where application shall have been filed before the commission, in accordance with the provisions of this section, until a determination of such application by the commission." The provision was modified in the Transportation Act of 1920, Pub. L. No. 66-152, § 406, 41 Stat. 456, 480, and deleted in the Transportation Act of 1940, Pub. L. No. 76-785, § 6, 54 Stat. 898, 904, meaning it was in force at the time of the *Patterson* shipments (1916-1918), 269 U.S. at 6-7.

The line of ICC § 1(5) cases endorsed in *Patterson,* creating the rule that a through rate exceeding the sum of intermediate rates is rebuttably presumed unreasonable, apparently refers only to the *contemporaneously filed* rates. All thirteen ICC cases cited on the point in *Patterson,* 269 U.S. at 10 n.2, follow this pattern, and no party cites a case to the contrary. Here, of course, the Express joint rate exceeded the sum of the intermediates only when a later-stipulated rate was substituted for one of the contemporaneously filed rates. Thus, FERC's approach is *doubly* removed from the ICC/*Patterson* rule, in that the agency (1) found the presumption triggered by a mixed batch of rates (some contemporaneously filed, another stipulated as reasonable after the fact), and (2) made the presumption irrebuttable.

The parties dispute not only the pre-1977 interpretations of § 1(5) but also the question whether FERC's methodology follows logically from *Texaco Pipeline, Inc.,* 72 FERC ¶ 61,313 (1995), in which FERC approved a proposed joint rate prospectively, saying that the ceiling for a joint rate was "the sum of the ceiling levels associated with the individual tariff rates currently on file," 72 FERC at 62,310. FERC's method here of adding up segment rates to determine a benchmark for reparations does not follow from *Texaco.* For three of the four segments, FERC used filed rates, on which *Texaco* never relied. (The filed rates in *Texaco* happened to be the same as the ceiling levels, but that was mere coincidence.) And for the remaining segment, FERC used a rate stipulated to be reasonable pursuant to a settlement of cost-of-service proceedings, violating the historic principle that a through rate cannot be judged on the basis of a traditional cost inquiry into *some* segments unless the agency allows the carrier to be heard on costs for other segments. *Texaco* did not remotely question that principle; on the contrary, it implicitly honored it by adding apples to apples

(ceilings to ceilings), summing figures that approximated cost by a single method of computation.

FERC also makes a waiver argument that rests on its misreading of *Texaco*. It claims that its first order in 2001 gave the carriers fair warning that FERC planned to award reparations for the difference between the joint rate and the sum of the locals (three as filed, one as later stipulated); if the carriers didn't like the approach, they should have objected back then. Here is what the *First 2001 Order* said:

> Our policy has been that a joint rate is just and reasonable if it is less than or equal to the sum of the local interstate rates currently on file with the Commission. [Citation to *Texaco*.] If a pipeline participant in a joint rate does not have a corresponding local interstate rate on file with the Commission, the joint rate can be found to be just and reasonable so long as it is less than or equal to the sum of the local interstate rates of the remaining joint participants that are on file with the Commission. . . .
>
> . . . .
>
> . . . If it is established that [Frontier and Anschutz's local] rates are just and reasonable, it can be assumed that the subject Express joint rates meet the standard set forth in *Texaco*. However, if it is shown that the local rates of Frontier and Anschutz are not just and reasonable, then the Express joint rates must be recalculated in accordance with *Texaco*.

*First 2001 Order*, 94 FERC at 62,259-60 (footnotes omitted).

Contrary to FERC counsel's argument, these passages cannot be said to anticipate the approach ultimately adopted. The order says that a joint rate can be reasonable "if" or "so long as" it doesn't exceed the sum of the locals "on file." The

language (1) is literally consistent with *Texaco* correctly read, if one assumes the filed rates are no greater than the ceiling levels, as the regulations require, but (2) does not necessarily imply the converse, i.e., that the joint rate is reasonable *only if* it doesn't exceed the sum of filed rates. The converse—a rule that any filed through rate exceeding the sum of the filed local rates is unjust and unreasonable—essentially transforms *Texaco*, even though the order never suggests that it is modifying *Texaco* at all. A reasonable participant in the process could not be expected to infer that the Commission would spin *Texaco* so offhandedly into a repudiation of decades of application of § 1(5). Worse, even if the converse rule were implied, it does not match what FERC ultimately did (add up three filed rates and one later-determined reasonable rate).

More broadly, it isn't clear what a reasonable reader anticipating an extension of *Texaco* to the reparations domain should have expected. A literal extension of *Texaco*'s principle—that the ceiling for a joint rate is the sum of the ceilings of the intermediates—might suggest that reparations should equal the difference between the joint rate and the sum of the contemporaneously existing ceiling levels (there being no express provision in the regulations fitting a recomputation of ceiling levels into the ICA's provision for reparations). But the *First 2001 Order* couldn't have meant this, for even if the shippers alleged that the challenged rates exceeded contemporaneous ceiling levels (and it seems, from the one complaint presented to us, Joint Appendix at 137-38, that they made no such allegation), FERC stated that the rates would need to be recalculated under *Texaco* upon a finding that "the local rates . . . are not just and reasonable"—a finding that, given the very same order's mandate of individual cost-of-service hearings, FERC clearly believed might be premised on something other than a violation of contemporaneous ceiling levels.

Given the ill fit between the language of the *First 2001 Order* and the reparations process, and the fact that these passages never refer to reparations, a reasonable observer would likely suppose that they referred only to prospective relief, a matter then still entirely up in the air. Indeed, the final quoted sentence—that if the challenged local rates are found unreasonable, the joint rates "must be recalculated in accordance with *Texaco*"—makes perfect sense if confined to prospective relief: if one or more challenged local rates were found unreasonable and therefore reduced, the reductions would automatically reduce the segments' respective ceiling levels, 18 C.F.R. § 342.3(d)(5), which under *Texaco* would automatically reduce the joint rate's ceiling level, which would require that the joint rate be "recalculated" (and under some circumstances, e.g., if all filed segment rates had been at their prior ceiling levels, reduced), see 18 C.F.R. § 342.3(e). In any event, FERC cannot prevail on waiver.

In addition, the Commission seeks to justify its override of historic practice and case law under § 1(5) by invoking the EPAct's general mandate to simplify ratemaking. It notes that the carriers' proposed rule—allowing a carrier to show that because *other* intermediate rates on the through route were below their respective reasonable maximums the overall through rate was reasonable—would require individual inquiries into pipeline costs, exactly the sort of onerous and complex proceeding that the EPAct and Order No. 561 sought to sidestep. Thus FERC purports to see that act as a policy watershed that justifies minimizing the importance of pre-EPAct precedent. See *Rehearing Order,* 108 FERC at PP 36, 45, pp. 62,102-03; see also *id.* at P 9, p. 62,097.

Administrative simplicity is a value, and agencies may take it into account—EPAct or not. See, e.g., *Consolidated Edison Co. of New York v. FERC*, 315 F.3d 316, 325 (D.C. Cir. 2003) (approving FERC's invocation of "administrative

convenience" in a proceeding under the Natural Gas Act); *Illinois Public Telecommunications Association v. FCC*, 117 F.3d 555, 565 (D.C. Cir. 1997) (evaluating on the merits an agency claim of "administrative convenience" in a proceeding under the Telecommunications Act but finding the burdens avoided by the agency's approach too small to justify the cost). But we know of no case, and can't imagine one from an American court, where simplification's value has been taken to justify the exclusion of all data supporting one side when equivalent data supporting the other has been admitted. True, by virtue of a stipulation here the cost issue for Frontier's leg of the journey was resolved without a cost inquiry. But that was a fluke. Essentially, FERC's approach is to review a joint rate on the basis of individual cost-of-service inquiries into the local rates, but only the *rates picked by shippers*.

We have up to this point discussed the case under ICA § 1(5) and sections applicable to a § 1(5) case. The orders on review, however, also lean heavily on ICA § 4(1)'s aggregate-of-intermediates clause. *Rehearing Order*, 108 FERC at PP 37-41, 46-50, pp. 62,102-04; *Reparations Order*, 106 FERC at P 12, p. 61,570-71. Yet the agency's brief before this court downplays the clause. Brief for Respondent at 19-31; but see *id.* at 30-31. Counsel at oral argument, when asked, with reference to § 1(5) and § 4(1), "under what section was the Commission acting," responded, "The Commission decided this case under § 1(5)." Oral Arg. Tr. at 37. We take Commission counsel at her word.

Because of possible confusion on remand, however, we think it important to remind FERC that *Patterson* drew clear distinctions between § 1(5) and § 4(1), particularly in the passage from that case quoted in our discussion of § 1(5), above.

We note but do not rule on the carriers' two key objections to the orders as attempted applications of § 4(1). First they argue that in the ICC's pre-1977 decisions the term "intermediate rates" in the aggregate-of-intermediates clause refers to the "contemporaneously effective" rates, i.e., filed rates. See *Omaha Chamber of Commerce Traffic Bureau v. Atlanta, Birmingham & Atlantic Railway Co.*, 93 I.C.C. 583, 585 (1924). FERC adduces no ICC decision to the contrary, and all that we have seen, such as those cited in *Patterson*, 269 U.S. at 10 n.3, appear consistent with the principle. Second, the carriers say that any monetary recovery under the aggregate-of-intermediates clause requires a showing of "actual damage," typically (perhaps exclusively) injury to a shipper disadvantaged by the challenged rate in *competition* with firms enjoying the lower rates used for comparison, as was true under the short-haul/long-haul provision of § 4(1), *Davis v. Portland Seed Co.*, 264 U.S. 403, 425-26 (1924), and under the ICA's express ban on discriminatory rates (ICA § 2, 49 U.S.C. app. § 2 (1988)), *Pennsylvania Railroad Co. v. Int'l Coal Mining Co.*, 230 U.S. 184, 197-208 (1913).

Finally, we must address FERC's attempted reliance on ICA § 6(7), 49 U.S.C. app. § 6(7) (1988). It establishes the familiar filed rate doctrine, i.e., the rule that a carrier may charge no more than the filed rate even if that rate is lower than the maximum just and reasonable rate:

> No carrier . . . shall engage or participate in the transportation of . . . property . . . unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation . . . of property . . . between the points named in such tariffs than

the rates, fares, and charges which are specified in the tariff filed and in effect at the time.

FERC contends that this provision supports its approach to joint-rate reparations. *Rehearing Order*, 108 FERC at PP 14-18, pp. 62,098-99. The Commission's idea seems to be that allowing the carriers to show, in defense, that the local rates for some segments were below the just and reasonable level, would somehow implicate this provision. The argument flies in the face of decades of ICC practice; as we just saw, this allowed carriers that have charged a through rate higher than the sum of the intermediate filed rates to rebut the inference that the through rate was unreasonable under § 1(5). It also violates ordinary language. Section 6(7) merely prohibits a carrier from charging more than the rate "in effect at the time" of the shipment. Nobody says that the carriers here did such a thing. FERC's § 6(7) argument is wholly without merit.

On remand, FERC must consider whether the prior judicial constructions of ICA § 1(5) in *Sloss-Sheffield*, *Great Northern*, and *Patterson* preclude its condemnation of the joint rate here without considering the reasonableness of the rate as an aggregate. See *National Cable & Telecommunications Association v. Brand X Internet Services*, 125 S. Ct. 2688, 2700 (2005); *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-45 (1984). If they do not, of course, the Commission must explain why its approach is a reasonable construction. Further, to persist in the outcome here it would have to explain its deviation from the ICC's pre-1977 applications of § 1(5).

We need not reach the carriers' claims that FERC erred in its damage calculations by using discounted rates and excluding the local rate of Platte Pipe Line Company.

## II. The Shippers' Petition

The award that prompted the carriers' petition concerned a set of shipments made by the shipper-petitioners (Big West and Chevron Products) as owners of the oil from the moment it left the border (if not earlier), contracting directly with the carriers. But there was a second set of shipments made by third-party owner-shippers, who had contracted to sell the oil to Big West and Chevron Products under price terms that specifically included whatever the carriers had charged for transportation, plus an additional amount dependent on various factors that don't concern us. The shipper-petitioners characterize their contracts with the third parties as "cost-plus" contracts, in that the price consisted of the cost of transportation from the border to Salt Lake City, plus additional charges that didn't vary with that cost. We assume in the shipper-petitioners' favor that their version of events is accurate.

In their response to Frontier's compliance filing, Big West and Chevron Products sought reparations for any overcharges on the second set of shipments, reasoning that such charges had been "passed on" to them via the cost-plus contracts. FERC rejected this "pass-on" theory, holding that damages under the ICA were available only to shippers who were in privity with the carrier (i.e., who directly or through an agent contracted with it). *Reparations Order*, 106 FERC at PP 24-28, pp. 61,572-73. The shippers requested rehearing, which FERC denied. *Rehearing Order*, 108 FERC at PP 54-88, pp. 62,105-10. Big West and Chevron Products now petition for review.

Reparations for violations of the ICA are generally governed by § 8, 49 U.S.C. app. § 8 (1988), under which a person who commits an "unlawful" act under the statute is "liable to the person or persons injured thereby for the full

amount of damages sustained in consequence of any such violation." The language appears very general, saying nothing to suggest that it would be unreasonable under *Chevron* for the Commission to limit damages to parties who were directly charged for the overpriced service.

Nor do prior judicial interpretations of the ICA support the shipper-petitioners' contention. In *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918), carriers asserted passing on as a defense, i.e., they argued that plaintiff-shippers had passed the overcharge onto their customers and therefore hadn't been injured. The Court rejected the defense, declaring that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step," *id*. at 533, thus avoiding the "endlessness and futility of the effort to follow every transaction to its ultimate result," *id*. at 534. The shipper-petitioners say that *Darnell-Taenzer* applies only to passing-on as a defense, but it was hardly unreasonable of FERC to find that the Court's critique of the theory applies as well when it's used offensively. Cf. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-36 (1977) (holding that under Clayton Act § 4, 15 U.S.C. § 15, the pass-on theory *must* be treated the same regardless of whether it's used offensively or defensively).

In *Sloss-Sheffield*, also involving defensive use of passing on, the Court identified a complication affecting any purported calculation of the true economic incidence of the overcharge. The carrier asked the Court to create an exception to *Darnell-Taenzer* for cases where the shipper and its buyer invariably used a cost-plus contract, i.e., one that set the price equal to the actual rate paid for the transportation (even if the rate rose or fell after the agreement was made), plus a fixed dollar amount per ton. *Sloss-Sheffield*, 269 U.S. at 235-36. The Court refused, since the cost-plus arrangement

didn't altogether negate the economic effect of the overcharge on the shipper:

> The [carrier's argument] ignores the commercial significance of selling at a delivered price. When a seller enters a competitive market with a standard article he must meet offerings from other sources. On goods sold f.o.b. destination [i.e., where the seller is liable to the carrier for the price of transportation, and the buyer doesn't take title to the goods until they arrive], the published freight charge from the point of origin becomes, in essence, a part of the seller's cost of production. An excessive freight charge for delivery of the finished article affects him as directly as does a like charge upon his raw materials.

269 U.S. at 237-38. That is, a shipper facing an overcharge for transportation must (1) maintain its price and accept a lower profit per unit, or (2) raise its price, at the expense of risking loss of some (perhaps all) sales. Even if the contract nominally imposes the cost of transportation on the buyer, the parties may take account of the overcharge when bargaining over the other component(s) of the price.

*Sloss-Sheffield*'s point has broader significance. Parties agreeing on a sale at a price that fluctuates with shipping costs do so aware that post-shipment regulatory intervention may ultimately decrease that cost. As to disposition of the reparations, any explicit arrangement that they make presumably controls as between the contracting parties. The rule of *Sloss-Sheffield* (understood in light of *Darnell-Taenzer*) seems to be that—absent any express provision—reparations go by default to the party who contracted with the carrier, since the overcharge is easiest to discern and measure in the context of the shipper-carrier transaction, whereas the overcharge's ultimate impact on transactions and parties down

the supply chain is far less ascertainable. As we shall see, there are contract clauses from which courts or agencies might draw a different inference, such as a provision making the party contracting with the carrier the *agent* of the other party. But the shipper-petitioners here asserted no such provision.

The shipper-petitioners attempt to distinguish *Sloss-Sheffield* by noting that, in the ICC proceedings, "both the consignor and the consignees claimed reparation." 269 U.S. at 237. The case gave preference to direct purchasers of transportation, they argue, only because direct and indirect purchasers were seeking to recover the same overcharge in a single proceeding, forcing the ICC to choose between them to prevent double recovery. Reply Brief of Petitioners Big West Oil, LLC and Chevron Products Company at 7-9. In fact, however, *Sloss-Sheffield* mentions the competing claimants only in passing and says nothing to suggest that its holding is needed to thwart a risk of double recovery. 269 U.S. at 237-38. More generally, as the risk of double recovery seems to have played no role in FERC's decision, we need not address the shipper-petitioners' efforts to assuage our hypothetical anxiety that accepting their view might generate such a risk.

The shipper-petitioners contend that *Gabbert v. Atchison, Topeka & Santa Fe Railway Co.*, 93 F.2d 562 (5th Cir. 1937), interprets *Sloss-Sheffield* in a way that favors their position. They are mistaken. In allowing purchasers to recover freight overcharges the *Gabbert* court distinguished *Sloss-Sheffield* by noting that (1) the *Gabbert* purchasers took title to the goods before shipment, and (2) the sellers acted as the buyers' agents in making physical payment of the charges. *Id*. at 562-63. In our case, by contrast, the shipper-petitioners concede that they took title only after shipment, and they don't allege that the third-party firms acted as their agents.

*McCarty Farms, Inc. v. Burlington Northern, Inc.*, 91 F.R.D. 486 (D. Montana 1981), also cited by shipper-petitioners, held that farmers selling wheat on consignment had standing to sue a carrier for overcharges even though only the consignees actually contracted with the carrier. *Id*. at 487 & n.2, 492. FERC distinguished *McCarty* on the ground that the consignors held title to the goods before and during shipment and also (apparently) on the ground that the consignees in paying the freight acted as agents for the consignors. *Rehearing Order*, 108 FERC at P 69, pp. 62,107-08. *McCarty* itself, however, never says which party held title at what point nor mentions a principal-agent relationship; and the consignment relationship *per se* doesn't imply who would hold title at what point or necessarily imply a principal-agent relationship. See RESTATEMENT (SECOND) OF AGENCY § 14J (1958) (existence of agency relation in consignment determined by parties' agreement on obligations of consignee); *id*. cmt. b (title in consignment relation).

The principal affirmative basis for the *McCarty* decision was *Adams v. Mills*, 286 U.S. 397, 407-08 (1932), a decision straightforwardly applying *Sloss-Sheffield* (and, like it, authored by Justice Brandeis) to reject the carrier's passing-on defense. In *Adams*, plaintiff-consignees had been liable for the charges and had paid them, and the decision affirms their right to recover. *Id*. at 405-09. But they had evidently been reimbursed for the charges by the consignors. *Id*. at 407. *Adams* was at pains to make clear that "[t]he rights of the shippers in the proceeds of the action will not be affected by [the Court's] decision," that those rights "might have been asserted by intervention" in the Commission proceeding, and that they might still be asserted. *Id*. at 407-08. The *Adams* dictum thus seems to go no further than to suggest that where the party with the legal obligation to pay the carrier does so, and is reimbursed by another party, the reimbursing party can

protect its interests and in some way participate in the action before the Commission.

Thus, even if *Adams*'s dictum represented a statutory reading precluding contradiction by the Commission under *National Cable* (and we do not decide whether it does), that reading wouldn't apply to this case. As to *McCarty*'s extension of the *Adams* dictum, we find that it neither pays deference to the Interstate Commerce Commission (unsurprising as it antedates *Chevron* and deals with class certification prior to an ICC proceeding, *McCarty*, 91 F.R.D. at 486-87) nor represents an interpretation unambiguously compelled by the statute. Any error by FERC in its treatment of *McCarty* is harmless. See 5 U.S.C. § 706 (in judicial review of agency action, "due account shall be taken of the rule of prejudicial error"); *PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004).

Perhaps sensing that the cases interpreting the ICA provide (at best) no support for their pass-on theory, the shipper-petitioners argue in the alternative that those decisions have been implicitly modified by more recent decisions of the Supreme Court discussing the pass-on theory under an entirely different statute, Clayton Act § 4, 15 U.S.C. § 15 ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained"). In a succession of cases, the Court has refused to allow passing on either as an affirmative theory of recovery or as a defense, while preserving the possibility of its use in the case of a "pre-existing cost-plus contract."

Thus in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court held that a pass-on defense was generally impermissible under Clayton Act § 4, for two reasons: it was impractical to discern how the

economic consequences of an overcharge were distributed, *id*. at 492-93; and plaintiffs further down the supply chain would normally have smaller stakes and would therefore be less inclined to enforce their rights, *id*. at 494. But the Court noted a possible qualification: "We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." *Id*. The Court also rejected passing-on, but referred to the same possible exception, in *Illinois Brick*, 431 U.S. at 735-36, and in *Kansas v. Utilicorp United, Inc*., 497 U.S. 199, 217-18 (1990) (rejecting effort to analogize customers of a utility with regulated prices to buyers under a cost-plus contract, to enable them to recover from natural gas suppliers who allegedly overcharged the utility).

We reject the shipper-petitioners' contention that these decisions' language preserving a possible exception for the "pre-existing cost-plus contract" renders FERC's denial of their pass-on theory unreasonable. *Hanover Shoe*, *Illinois Brick*, and *Utilicorp* construe Clayton Act § 4 de novo, choosing what the Court considers to be the single best approach to damages under that provision. They do not purport to establish a general federal law of damages. See, e.g., *Illinois Brick*, 431 U.S. at 736-37 (characterizing the question as one of statutory construction). Here, FERC construes the ICA, a different statute and one that Congress has empowered the agency to administer with the benefit of its expertise. The Clayton Act cases raise the possibility of a "pre-existing cost-plus contract" exception (and we emphasize they never call it more than a possibility) only because the Court theorizes that such a contract might eliminate all the uncertainties normally inherent in applying a pass-on theory. The degree to which a particular contract can actually fulfill

that promise depends on how precisely one can discern the motivations of economic actors under various constraints. And, at any given level of precision, there remains the question of how to weigh the costs of calculation and of residual error against the potential advantages of a rule that supposedly allocates damage rights in more exact conformity with the actual economic burden of an overcharge. These issues are not specifically addressed by Congress in the Clayton Act or the ICA. In the present case, they are for FERC to judge. And the agency has made a reasoned judgment, stating that the pass-on theory would "complicate unnecessarily the Commission's administration of the ICA," *Rehearing Order*, 108 FERC at P 82, p. 62,109, by saddling the agency with the "difficulties of isolating transportation costs," *id*. at P 84, 62,109. In apparent response to the shipper-petitioners' assertions about the advantages of a more economically exact allocation of damage rights, the agency noted that parties remain free to make "private agreements . . . to share responsibility for transportation or any other costs." *Id*. at P 85, p. 62,110.

On this point, shipper-petitioners again cite *McCarty*, this time for the proposition that *Hanover Shoe* and *Illinois Brick* seriously modified the prior interpretations of the ICA in *Darnell-Taenzer* and *Sloss-Sheffield*. *McCarty*, 91 F.R.D. at 489. But *McCarty* involved a controversy over class certification prior to an ICC proceeding; it was not reviewing an agency construction of the statute. 91 F.R.D. at 486-87. We further note that so far as appears the defendant in *McCarty* neglected to assert the main problem that *Illinois Brick* said rendered the theory impractical (i.e., the difficulties of discerning how the transportation overcharge interacted with other market conditions in determining the price of the good), or, if it did, the court declined to grapple with such difficulties. See *McCarty,* 91 F.R.D. at 491-92 & nn.15-16.

The shipper-petitioners cite *OXY USA, Inc. v. FERC*, 64 F.3d 679 (D.C. Cir. 1995), but it is of no use to them. That case concerns whether parties not in privity with carriers may have standing to contest FERC rulings under the ICA, not whether they have a right to reparations. *Id*. at 697. Finally, the shipper-petitioners argue in a footnote that FERC's stance is inconsistent with prior ICC decisions. Appeal Brief of Petitioners Big West Oil, LLC and Chevron Products Company at 28 n.64. They did not raise this argument below, see Request for Rehearing of Big West Oil LLC and Chevron Products Company at 1-26; Response of Complainants Big West Oil LLC and Chevron Products Company to Compliance Filing of Frontier Pipeline Company etc. at 28-33, and thus we do not consider it.

* * *

The carriers' petition is granted, the shippers' petition is denied, and the case is remanded for further proceedings consistent with this opinion.

*So ordered*.