# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 17, 2011　　　　Decided April 17, 2012

No. 11-1021

MOBIL PIPE LINE COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CANADIAN NATURAL RESOURCES LIMITED, ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

———

*Joseph Guerra* argued the cause for petitioner. On the briefs were *James F. Bendernagel, Jr.*, *Lorrie M. Marcil*, *Christopher M. Lyons*, and *Eric D. McArthur*.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With her on the brief were *Robert H. Solomon*, Solicitor, and *Judith A. Albert*, Senior Attorney. *Robert J. Wiggers* and *John J. Powers, III*, Attorneys, U.S. Department of Justice, entered appearances.

*Marcus W. Sisk, Jr.*, *Frederick G. Jauss IV*, and *James H. Holt* were on the brief for intervenors Canadian Natural Resources Limited, et al. in support of respondents.

Before: SENTELLE, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Congress has directed the Federal Energy Regulatory Commission to ensure that oil pipeline rates are "just and reasonable." When the market in which a pipeline operates is not competitive, the Commission caps the pipeline's rates. When the market in which a pipeline operates is competitive, however, the Commission generally allows the pipeline to charge market-based rates.

Mobil owns and operates the Pegasus crude oil pipeline, which runs from Illinois to Texas. The pipeline transports mostly Western Canadian crude oil. Out of the 2.2 million barrels of Western Canadian crude oil produced each day, Pegasus transports only about three percent – about 66,000 barrels each day.

In light of the competitiveness of the Western Canadian crude oil market and Pegasus's minor role in it, Mobil applied to FERC for permission to charge market-based rates on Pegasus. FERC's expert staff examined the market and deemed this case a "slam dunk" for allowing Mobil to charge market-based rates. But the Commission itself came out the other way and denied Mobil's application on the ground that Pegasus possessed market power.

We conclude that the Commission's decision was unreasonable in light of the record evidence. The record shows that producers and shippers of Western Canadian crude oil have numerous competitive alternatives to Pegasus for transporting and selling their crude oil. Pegasus does not possess market power. We grant Mobil's petition for review, vacate FERC's order, and remand to the Commission for further proceedings consistent with this opinion.

I

A

Congress has directed FERC to ensure that oil pipelines charge "just and reasonable" rates. 49 U.S.C. app. § 1(5) (1988); *see Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir. 2006).

To implement that command, the Commission regulates rates via an indexing system. *See* Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992 (Order No. 561), 58 Fed. Reg. 58,753, 58,754 (Nov. 4, 1993). Under FERC's indexing system, an oil pipeline must establish an initial baseline rate with the Commission. 18 C.F.R. § 342.1(a). That rate is usually determined by a pipeline's cost of providing service, including a reasonable return on investment. 18 C.F.R. § 342.2; *see also* 58 Fed. Reg. at 58,758. After FERC accepts a pipeline's initial baseline rate, the pipeline may increase that rate up to a ceiling set by the Commission's indexing formula. 18 C.F.R. § 342.3. FERC's indexing system allows oil pipelines to adjust their rates to account for inflation, while protecting shippers from large rate increases. 58 Fed. Reg. at 58,758.

But rates set by indexing "do not function well to signal individuals how to efficiently respond to changes in market conditions."   Market-Based Ratemaking for Oil Pipelines (Order No. 572), 59 Fed. Reg. 59,148, 59,150 (Nov. 16, 1994).   To address that shortcoming, FERC may authorize pipelines to charge rates established by market competition instead of indexing.  *See* 18 C.F.R. §§ 342.4(b), 348.1, 348.2. Market-based rates "can result in pricing that is both efficient and just and reasonable."  59 Fed. Reg. at 59,150.

A pipeline does not have a unilateral right to charge market-based rates.  Rather, in order to charge market-based rates, a pipeline must obtain approval from the Commission. *See* 18 C.F.R. §§ 342.4(b), 348.1, 348.2.

FERC Order No. 572 guides the Commission's consideration of applications for market-based rate authority. 59 Fed. Reg. at 59,149.  Under Order No. 572, FERC's inquiry centers on whether a pipeline possesses market power. *Id*. at 59,150.  To qualify for market-based rate authority, a pipeline must demonstrate that it lacks market power in its product and geographic markets.   18 C.F.R. §§ 342.4(b), 348.1(c)(1), (2).  FERC has said that market power is "the ability profitably to maintain prices above competitive levels for a significant period of time." *See* Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 0.1 (rev. ed. 1997); *see also Mobil Pipe Line Co.*, 133 FERC ¶ 61,192, at 61,950-51 (2010); *Explorer Pipeline Co*., 87 FERC ¶ 61,374, at 62,392 (1999); *SFPP, L.P.*, 84 FERC ¶ 61,338, at 62,497 (1998).  As that standard formulation suggests, FERC has decided to adhere to well-settled economic and competition principles in determining whether an oil pipeline possesses market power.

5

B

Pegasus is an 858-mile, 20-inch-diameter crude oil pipeline owned and operated by Mobil. Until April 2006, Pegasus transported about 66,000 barrels of crude oil per day from Nederland, Texas, to Patoka, Illinois. Rapid development of the Western Canadian oil sands, however, made transportation of Western Canadian crude oil to new markets an attractive proposition. To take advantage of that opportunity, in April 2006, Mobil reversed the direction of the flow of crude oil on Pegasus so that it could transport Western Canadian crude oil southward.

Pegasus now transports almost entirely Western Canadian crude oil from Illinois to Texas. The crude oil comes to the Pegasus pipeline in Illinois by pipelines from Western Canada. Importantly, Pegasus transports only about 66,000 barrels of Western Canadian crude oil each day – which is only about three percent of the 2.2 million barrels of Western Canadian crude oil produced each day.

Mobil filed an application with FERC to charge market-based rates on Pegasus. The Commission scheduled an initial hearing before an administrative law judge to determine whether Pegasus possessed market power. At the hearing, FERC's expert staff strongly supported Mobil's application for market-based rate authority, concluding that Pegasus's origin and destination markets were plainly competitive.

The contested issue here concerns Pegasus's origin market.[1] FERC's expert staff defined that market as

---

[1] FERC recognized that Pegasus's Gulf Coast destination market is extremely competitive. Refineries and other entities in the Gulf Coast that want to obtain crude oil obviously have

consisting of the competitive alternatives available for producers and shippers of Western Canadian crude oil to transport and sell their crude oil. Those alternatives include local refineries in Western Canada and refineries throughout Canada and the United States that can be reached by pipelines.

In arguing that Mobil should be allowed to charge market-based rates on the Pegasus pipeline, FERC's expert staff did not think this a close case. To get a flavor of the expert staff's views, we here quote some of their observations:

- "Staff's competitive story is that of a competitive origin market with a small pipeline – the Pegasus straw – through which producers or shippers can access refiners in a competitive destination market." J.A. 787.
- "[T]here is little difference between the destination market for Pegasus and the origin market. . . . What we have are two competitive markets . . . ." J.A. 788-89.
- "[I]f one excludes Pegasus from the analysis and finds the origin market competitive, then logic suggests that adding a small player such as Pegasus to the competitive market will not render the market less competitive." J.A. 618.
- "[H]ow can a small pipeline exert market power over a large origin market?" J.A. 617.
- "Pegasus clearly cannot be a monopolist for the transportation" of "Western Canadian crude . . . as the

numerous alternatives to Pegasus-transported crude oil. The competitiveness of Pegasus's destination market is not disputed in this litigation.

supply of such products . . . vastly exceeds Pegasus's capacity." J.A. 825.

- "[I]t is clear that Pegasus is not a monopolist, nor does it possess significant market power. It makes no economic sense for Pegasus to be considered a monopolist . . . in an expansive geographic market . . . . Nor does it make economic sense to claim that a new entrant to a market is a monopolist . . . ." J.A. 714.

- "There are no allegations or evidence that the market associated with the Alberta producing area was not competitive prior to 2006. The reversal of the Pegasus line (in 2006) effectively created a new supplier of crude oil transportation service out of [that] origin market . . . ." J.A. 628.

- "As Staff developed its analysis, it seemed illogical that when we looked at the competitive alternatives that Western Canadian producers had to dispose of their crude oil, they faced a very unconcentrated set of destinations *until* Pegasus reversed its flow. How can these same producers (or producer-shippers) be said to face a *less competitive* set of alternatives when they have an additional outlet, albeit small, for their crude oil? Logic would dictate the opposite conclusion." J.A. 791.

- "[T]hese very alternatives were available to the Western Canadian . . . shippers prior to the 2006 reversal of the Pegasus line, and are still being used. It is difficult to believe that these alternatives, given current usage, are no longer viable or competitive . . . ." J.A. 728.

- "[I]t is literally impossible for a recent entrant to be a monopolist if it is entering an already established market." J.A. 640.

Despite the force of the conclusions reached by FERC's expert staff, the Commission denied Mobil's application for market-based rate authority. FERC reasoned that Pegasus possessed market power in its origin market. Indeed, FERC actually concluded that Pegasus had a *100 percent market share* in that market.

Mobil timely petitioned for review in this Court. We assess FERC's order under the Administrative Procedure Act's arbitrary and capricious standard. That standard requires that FERC's decision be reasonable and reasonably explained.

## II

FERC denied Mobil's application for market-based rate authority on the ground that Pegasus possessed market power in its origin market. Indeed, FERC reached the rather extraordinary conclusion that Pegasus possessed a 100 percent market share in that market. We find FERC's decision unsustainable.

The Pegasus pipeline transports almost exclusively Western Canadian crude oil. The proper question, therefore, is whether producers and shippers of Western Canadian crude oil must rely so heavily on Pegasus for transportation of their crude oil that Pegasus can be said to possess market power – that is, whether Mobil could profitably raise rates on Pegasus above competitive levels for a significant period of time because of a lack of competition. The answer is an emphatic no: Pegasus transports only about 66,000 of the 2.2 million barrels – about three percent – of Western Canadian crude oil produced each day.

Market-power analysis focuses on whether there are alternatives to a firm's services that constrain its ability to profitably charge prices above competitive levels for a significant period of time. The inquiry examines the alternatives reasonably available to consumers and the cross-elasticity of demand – that is, the extent to which consumers will respond to an increase in the price of one good by substituting or switching to another. *See, e.g.*, *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 469 (1992); *United States v. Microsoft Corp.*, 253 F.3d 34, 51-52 (D.C. Cir. 2001) (en banc) (per curiam); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001); 2B PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW ¶ 506a (3d ed. 2007); Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 1.11 (rev. ed. 1997).

In the crude oil context, because "crude oil in an area may either be exported out of the area or consumed, i.e., refined, in the area," a pipeline "transporting crude oil out of an area therefore competes with local crude refineries as well as with other crude transportation facilities." DEPARTMENT OF JUSTICE, OIL PIPELINE DEREGULATION 16 (1986) (footnote omitted). The competitive alternatives in crude oil pipeline origin markets thus include: (1) pipelines that transport crude oil out of the area and (2) local refineries. *Id.*

Here, in considering the relevant market, FERC's expert staff identified many local refineries that process Western Canadian crude oil, as well as several pipelines that move Western Canadian crude oil to other refineries in Canada and the United States. As the staff noted, the critical statistic is that about 97 percent of Western Canadian crude oil gets to refineries by means other than Pegasus.

Given that eye-opening 97 percent figure, Mobil rightly asks: How can Pegasus be said to possess market power over producers and shippers of Western Canadian crude oil when Pegasus transports only about three percent of Western Canadian crude oil? FERC has no good answer to that simple question. And the absence of a good answer is why FERC's expert staff concluded that this case was a "slam dunk" for market-based rates. Tr. of Administrative Hearing at 2216.[2]

The hole in the Commission's analysis is highlighted by the fact that Pegasus is a new entrant into a previously competitive market. Before Pegasus started transporting Western Canadian crude oil in 2006, producers and shippers of Western Canadian crude oil had numerous competitive alternatives for transporting and selling their crude oil. When Pegasus came onto the scene, it simply provided an additional alternative for Western Canadian crude oil producers and shippers. Basic economic logic dictates that the introduction of a new alternative into a highly competitive market further increases competition; it does not suddenly render a previously competitive market uncompetitive.[3]

---

[2] The Commission, of course, is by no means obliged to heed the advice of its expert staff. It is "our well-established view that an agency is not bound by the actions of its staff if the agency has not endorsed those actions." *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (quoting *Vernal Enterprises, Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004)); *see also Community Care Foundation v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003); *MacLeod v. ICC*, 54 F.3d 888, 891 (D.C. Cir. 1995). In this case, we cite the economic and legal analysis of FERC's expert staff only because we find it so persuasive.

[3] To be sure, the effect on competition can depend on the new entrant's size. But that is not an issue here, as shown by the statistics on Pegasus's market share.

Put simply, we fail to understand how the entry of Pegasus, which transports only about 66,000 barrels per day, into a previously competitive 2.2 million barrel per day market makes that market suddenly uncompetitive. As FERC's expert staff explained, "If you evaluate the market with no Pegasus, and it's clearly competitive, adding one more option can't possibly make the market less competitive." Tr. of Administrative Hearing at 2216. The Commission's contrary conclusion is analogous to saying that a new shoe store in a city has monopoly power even though there are already numerous shoe stores in the same city. That doesn't make much sense.

The Commission may have been led astray by its assessment that Mobil, if granted market-based rate authority, could raise rates on Pegasus by 15 percent or more. But the Commission calculated that figure by using Pegasus's *regulated* rate as the baseline. As FERC's expert staff explained, the 15 percent figure demonstrates only that Pegasus's regulated rate is below the competitive rate. The regulated rate does not reflect Pegasus's full value to Western Canadian crude oil producers and shippers. Therefore, the possibility that the market rate might be higher than the regulated rate does not show that Pegasus possesses market power.

FERC also seemed concerned that producers and shippers of Western Canadian crude oil could obtain higher prices on the Gulf Coast, thereby giving Pegasus undue leverage over producers and shippers of Western Canadian crude oil who sought that particular outlet. It is true that Pegasus is the primary avenue for producers and shippers of Western Canadian crude oil to get their crude oil to *Gulf Coast* refineries. But from the perspective of producers and shippers of Western Canadian crude oil, there is nothing unique about

*Gulf Coast* refineries, as distinct from other refineries available to them in Canada and the United States. *See Williams Pipe Line Co.*, 71 FERC ¶ 61,291, at 62,131 (1995) ("the real economic concern of shippers is the delivered product and its price rather than whether the product travels between specific locations via pipeline"). The overall picture here, as FERC's expert staff emphasized, is one of robust competition for Western Canadian crude oil: Producers and shippers of Western Canadian crude oil have numerous competitive alternatives to get their crude oil to refineries. If Pegasus raised its rates above competitive levels, then producers and shippers of Western Canadian crude oil would choose one of the many alternative outlets available to them. Those other outlets thereby constrain the rates that Pegasus can charge. There is thus no plausible way, as we see it and as FERC's expert staff saw it, to say that Pegasus holds a hammer over Western Canadian crude oil producers and shippers.

Moreover, contrary to FERC's suggestion, short-term price variations – which may temporarily make Gulf Coast refineries (and thus Pegasus) an attractive outlet for Western Canadian crude oil producers and shippers – are consistent with competition. *See Blumenthal v. FERC*, 552 F.3d 875, 883 (D.C. Cir. 2009); *Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964, 969 (D.C. Cir. 2005); *Interstate Natural Gas Ass'n of America v. FERC*, 285 F.3d 18, 32 (D.C. Cir. 2002); *see also Explorer Pipeline Co.*, 87 FERC ¶ 61,374, at 62,392, 62,394 (1999); *Longhorn Partners Pipeline, L.P.*, 83 FERC ¶ 61,345, at 62,380 (1998); *Williams Pipe Line Co.*, 71 FERC at 62,145; *Williams Pipe Line Co.*, 68 FERC ¶ 61,136, at 61,658 (1994). As FERC has previously explained, short-term price variations that result in regional price differentials do not establish market power. *See Explorer Pipeline Co.*, 87 FERC at 62,394 ("Differential pricing, when constrained by

effective competition, can materially improve the efficiency of transportation markets by allocating capacity to those shippers who value it the most, particularly in markets involving different degrees of geographic or seasonal variation."); *Longhorn Partners Pipeline, L.P.*, 83 FERC at 62,380 ("[A]ny price differential between the origin and destination markets does not confer monopolistic power upon [the pipeline], but rather it promotes competition.").

In sum, when an agency is statutorily required to adhere to basic economic and competition principles – or when it has exercised its discretion and chosen basic economic and competition principles as the guide for agency decisionmaking in a particular area, as FERC did in Order No. 572 – the agency must adhere to those principles when deciding individual cases. Here, the Commission jumped the rails by treating the Pegasus pipeline as the rough equivalent of a bottleneck or essential facility for transportation of Western Canadian crude oil. As we have explained, the record thoroughly undermines FERC's conclusion. The Commission's decision thus cannot stand.

* * *

We conclude that the Commission's denial of Mobil's application for market-based rate authority was unreasonable on the facts and evidence before it. We grant Mobil's petition for review, vacate FERC's order, and remand for further proceedings consistent with this opinion.

*So ordered.*